In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 21-2449

PROTECT OUR PARKS, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

PETE BUTTIGIEG, Secretary of Transportation, *et al.*,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cv-02006 — **John Robert Blakey**, *Judge*.

_____

ARGUED NOVEMBER 30, 2021 — DECIDED JULY 1, 2022

_____

Before WOOD and HAMILTON, *Circuit Judges*.[1]

WOOD, *Circuit Judge*. In 2016, after a nationwide search, the
Barack Obama Foundation decided to build the Obama Presidential Center in historic Jackson Park on Chicago's South

---

[1] Circuit Judge Kanne died on June 16, 2022, and did not participate in the
decision of this case, which is being resolved under 28 U.S.C. § 46(d) by a
quorum of the panel.

Side. The City of Chicago and the Chicago Park District embraced the plan. But a group of residents, under the banner of an organization called Protect Our Parks, Inc., vehemently opposed it. Two years ago, we dismissed Protect Our Parks' first effort to enjoin the project. *Protect Our Parks, Inc. v. Chi. Park Dist.*, 971 F.3d 722, 738 (7th Cir. 2020) ("*Protect Our Parks I*"), *cert. denied sub nom. Protect Our Parks, Inc. v. City of Chicago*, No. 21-1259, 2021 WL 1602736 (U.S. Apr. 26, 2021). Protect Our Parks, along with several individual plaintiffs, responded with the present action against the City and the Park District (to which we refer collectively as the City), as well as various state and federal officers, arguing that environmental reviews performed by federal agencies in connection with the project were inadequate under the National Environmental Policy Act, 42 U.S.C. §§ 4331–47, section 106 of the National Historic Preservation Act, 54 U.S.C. § 306108, and other similar statutes.

Protect Our Parks' central theory is that these laws required the agencies to consider alternatives to the Jackson Park site in their evaluation of possible environmental harms. It correctly notes that the agencies, taking a different view of the law, did not do this. The problem with this argument is that none of the federal defendants had anything to do with the site selection—it was the City that chose Jackson Park, and the federal agencies had (and have) no authority to move the project elsewhere. Federal law does not require agencies to waste time and resources evaluating environmental effects that those agencies neither caused nor have the authority to change. See *Dept. of Transp. v. Public Citizen*, 541 U.S. 752, 756

(2004). We thus affirm the order of the district court denying Protect Our Parks' motion for a preliminary injunction.[2]

## I

In 2014, the Foundation began searching for a home for President Obama's presidential library. After evaluating several potential sites, it chose Jackson Park, a public park in the neighborhood where President Obama lived and began his career as a community organizer, law professor, and state senator. The Center will feature a museum, a public library, spaces for educational and cultural events, green space, and an archive commemorating the life and legacy of the nation's first Black President. Construction of the Obama Presidential Center (the Center) is wholly funded by the Obama Foundation.

After the Chicago City Council unanimously approved building the Center in Jackson Park, the City acquired the needed parkland from the Chicago Park District, signed a use agreement with the Foundation, and prepared to break ground. When completed, the Center will take up 19.3 acres, which amounts to about 3.5% of Jackson Park.

## A

Although the federal government had no role in the Foundation's or Chicago's decision to house the Center in Jackson

---

[2] Although construction has already begun on the project, and so some of the harms Protect Our Parks wanted to avoid have already taken place (*e.g.*, the removal of trees), the overall effort is still in an early enough stage that more limited, but meaningful, injunctive relief is still possible. We are thus satisfied that the case has not become moot.

Park, the City's approval did trigger several federally mandated agency reviews. Protect Our Parks argues that these reviews were inadequate.

*The U.S. Department of Transportation's Section 4(f) Review.* The plans for the Center require the closure of portions of three roads within Jackson Park. To accommodate the resulting effect on traffic, the Chicago Department of Transportation has proposed using federal funding to build or improve other roads, bike paths, and pedestrian walkways in the park. To be clear, the plan to close portions of existing roads in the park did not require federal approval. See *Old Town Neighborhood Ass'n Inc. v. Kauffman*, 333 F.3d 732, 736 (7th Cir. 2003). What did give rise to the approval requirement was the plan to build replacement infrastructure using federal highway dollars. That brought the Federal Highway Administration (FHWA) into the picture; it was required to review the proposal under section 4(f) of the Department of Transportation Act of 1966 (codified at 49 U.S.C. § 303). Section 4(f) permits the Secretary of Transportation to approve transportation projects that have an impact on public parks or historic sites, so long as "(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park … resulting from the use." *Id.* § 303(c). The Center's proposal implicates four properties protected by section 4(f), including Jackson Park itself.

After a comprehensive analysis, the FHWA found that there was no feasible and prudent alternative to using section 4(f) properties for new transportation infrastructure, which was needed to substitute for the roads that would be elimi-

nated. The agency then considered nine alternatives to determine how to minimize any negative impacts on the affected parks and historic areas. The FHWA's analysis concluded that only one alternative (Alternative 9) would meet the project's goals of accommodating traffic changes and improving pedestrian and bike access to Jackson Park. The agency then designed studies of two sub-alternatives (Sub-alternatives 9A and 9B) before concluding that 9B would cause the least damage to properties protected by section 4(f).

*National Environmental Policy Act Environmental Assessment*. The National Park Service and the Department of Transportation conducted a joint environmental assessment pursuant to the National Environmental Policy Act (NEPA). See 40 C.F.R. § 1501.4 (2019) (explaining that agencies may prepare a concise environmental assessment to determine if a more detailed environmental impact is required). The assessment explained that the City had decided to place the Center in Jackson Park, that the City would close portions of three local roads to accommodate the Center, and that the federal government had no say in those matters. The federal government did have a role, however, in approving the new use of the parkland and funding for new transportation infrastructure in the park (more on this later).

On that basis, the agencies assessed the environmental impact of three options: Option A, in which neither the Park Service nor the federal Department of Transportation approved the City's plan; Option B, in which only the Park Service approved it; and Option C, in which both did. The agencies prepared an exhaustive review of the direct, indirect, and cumulative effects of each option, including the potential consequences on trees, wildlife, water quality, air quality, traffic

control, noise, and cultural resources. They found that Alternative C best met both agencies' goals. They also concluded that Alternative C would not have a significant impact on the environment, which meant that the agencies could move forward with only an environmental assessment, rather than a full-blown environmental impact statement. See *Public Citizen*, 541 U.S. at 757.

*Urban Park and Recreation Recovery Act Review.* The National Park Service also conducted a review under the Urban Park and Recreation Recovery Act (UPARR Act). See 54 U.S.C. §§ 200501–511. The UPARR Act, a grant program enacted in 1978, provided federal funds to local governments to improve urban parks and recreational facilities. Chicago received UPARR grants to rehabilitate Jackson Park in the 1980s. Any community that received a UPARR grant must maintain that land for public recreational use unless the Park Service approves converting the space for another purpose. The Park Service "shall approve" a proposed conversion if: (1) the conversion aligns with a local park-recovery action program, and (2) steps are taken to ensure that the community has "adequate recreation properties and opportunities of reasonably equivalent location and usefulness." 54 U.S.C. § 200507.

Because Chicago wanted to dedicate about ten acres of parkland to non-recreational space to make room for the Center's buildings and related transportation improvements, the City sought the Park Service's approval of a partial UPARR conversion. Specifically, the City proposed replacing the lost parkland by turning property on the Midway Plaisance between Stony Island Avenue to the east, and the Metra Electric Railway to the west, into public recreational space. The replacement parkland borders (and effectively extends) Jackson

Park's western border. Under the City's plan, the new space will include improvements such as pedestrian walkways and a play area. The plan would yield a net gain of about 6.6 acres of recreational space in Jackson Park. The Park Service considered the proposal, decided that the proposed replacement satisfied the UPARR Act's requirements, and approved a partial conversion to make way for the Center.

*Army Corps of Engineers Permits*. The City also needed to secure permits from the United States Army Corps of Engineers, which administers the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 401, and the Clean Water Act, 33 U.S.C. § 1251. The Rivers and Harbors Act regulates alterations to public works built by the United States to improve navigable waters. See 33 U.S.C. § 408. It bars such changes unless they comply with a safety-valve provision authorizing the Corps to allow an alteration or occupation that "will not be injurious to the public interest and will not impair the usefulness of" the federal project. *Id.* The City's plan includes building road improvements on about 1.32 acres of land falling within the Great Lakes Fishery and Ecosystem Restoration area, a large Corps-administered ecological-restoration project.

In 2019, the Park District requested a section 408 permit to build the Center. The City proposed to ameliorate the impacts of the new transportation projects by restoring a lagoon overlook in a nearby part of the park and planting additional native plants. Its plan would result in a net gain of about 1.1 acres to the area included in the ecological-restoration project. After determining that building the Center would not impair the federal project, the Corps approved a section 408 permit.

The City also sought permits allowing construction access to two existing bridges, which would require temporarily filling less than an acre of navigable waters. The Clean Water Act authorizes the Corps in its discretion to issue permits for the "discharge of dredged or fill materials into [] navigable waters[.]" 33 U.S.C. § 1344(a). The Corps decided that the proposed activity qualified for a permit and signed off on the City's plan.

*National Historic Preservation Act Review*. The National Historic Preservation Act (NHPA) requires federal agencies to "take into account the effect" of an "undertaking on any historic property" before approving the use of federal funds. 54 U.S.C. § 306108. Regulations issued by the Advisory Council on Historic Preservation require agencies to "make a reasonable and good faith effort" to identify historic properties, 36 C.F.R. § 800.4(b)(1), to assess adverse effects on such properties, *id.* § 800.5, and to consult certain stakeholders about potential alternatives that could mitigate harms to the properties, *id.* § 800.6(a).

The FHWA prepared an Assessment of Effects to Historic Properties related to the Center. The assessment found that the project would have an adverse effect on two historic properties: (1) the Jackson Park Historic Landscape District and Midway Plaisance; and (2) the Chicago Park Boulevard System Historic District. The Highway Administration then held several meetings with relevant stakeholders, including the Illinois State Historic Preservation Office, local parks advisory councils, and local historic preservation groups. In the end the agencies concluded that any effects from the project would not be significant.

B

The City's plan to build the Center in Jackson Park has been opposed from the start by Protect Our Parks, Inc., a non-profit organization started by Chicago residents who resist conversions of Chicago parkland. In 2018, Protect Our Parks filed its first lawsuit to stop construction of the Center. There it argued that building the Center in Jackson Park would violate state law, the Takings Clause of the Fifth Amendment, and the Due Process Clause of the Fourteenth Amendment. In *Protect Our Parks I*, we affirmed summary judgment for the defendants on the constitutional claims and dismissed the state-law claims for lack of standing, because the plaintiffs had only a general policy objection to the City's decision, not a concrete injury. See 971 F.3d at 738.

Six months later, and just days before the City broke ground on the Center, Protect Our Parks launched a renewed effort to persuade the court to halt construction. This time, it brought claims under the Administrative Procedure Act against the City and Park District, the Foundation, and a group of federal and state officers. At present, the individual defendants (all of whom were sued in their official capacities) are Pete Buttigieg, the Secretary of Transportation; Stephanie Pollack, the Acting Administrator of the FHWA; Deb Haaland, the Secretary of the Interior; Charles F. Sams III, the Director of the National Park Service; Christine Wormuth, the Secretary of the Army; Scott A. Spellmon, the Commanding General of the U.S. Army Corps of Engineers; Arlene Kocher, the Administrator of the Illinois Division of the FHWA; Matt Fuller, the Environmental Programs Engineer of the Illinois Division of the FHWA; and Jose Rios, the Region 1 Engineer of the Illinois Department of Transportation.

Protect Our Parks' fifteen-count complaint asserts that the defendants violated the following laws by moving ahead with the Center: section 4(f) of the Department of Transportation Act; the National Environmental Policy Act; the Urban Park and Recreation Recovery Act; sections 106 and 110(k) of the National Historic Preservation Act; the Rivers and Harbors Act; and the Clean Water Act. It promptly moved for a preliminary injunction, but the district court denied the motion, reasoning that Protect Our Parks was unlikely to succeed on the merits because its complaint simply repackaged the group's policy disagreements with the defendants' substantive decisions. Protect Our Parks then moved for an injunction pending appeal. We denied that motion because plaintiffs did not make a sufficiently strong showing that they were likely to succeed on the merits. See 10 F.4th 758, 763 (7th Cir. 2021). Protect Our Parks then appealed the district court's order denying the motion for a preliminary injunction. See 28 U.S.C. § 1292(a)(1).

## II

To secure a preliminary injunction, Protect Our Parks must show that it is "likely to succeed on the merits, … likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Defense Council*, 555 U.S. 7, 20 (2008). Protect Our Parks' primary problem stems from the first part of this test. The group argues that so long as it has even an ephemeral chance of winning on the merits, it has shown enough of a likelihood of success to secure an injunction. But Protect Our Parks' proposed standard cannot be reconciled with *Winter*'s reminder that the "likeli-

hood of success" and "likelihood of irreparable harm" re-quirements have teeth. See *id.* at 22. A plaintiff need not prove beyond a preponderance of the evidence that it will win on the merits, but it must at least make a "strong" showing of likelihood of success. See *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1754 (2021). As we now explain, Protect Our Parks has not made that showing here under any of the theories it has invoked.

## A

The National Environmental Policy Act of 1969 requires federal agencies to prepare an environmental impact state-ment (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Preparing an EIS is expensive and time-consum-ing: according to the agency charged with overseeing NEPA, the average environmental impact statement takes four and a half years to complete. COUNCIL ON ENV'T QUALITY, EXEC. OFF. OF THE PRESIDENT, ENVIRONMENTAL IMPACT STATEMENT TIME-LINES (2010-2018). In some circumstances, however, agencies may instead conduct an environmental assessment (EA), a less burdensome form of preliminary review used to decide whether a proposed action will cause such significant harm to the environment that an EIS is necessary. See 40 C.F.R. § 1501.3 (2019); *Public Citizen*, 541 U.S. at 757; *Ind. Forest All., Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 856 (7th Cir. 2003). With an environmental assessment in hand, an agency has two choices: proceed with the full EIS, or issue a "finding of no significant impact," generally referred to as a FONSI, explain-ing why the proposed federal action would not significantly affect the human environment. See 40 C.F.R. §§ 1501.3, 1508.9

(2019).[3] When reviewing agency action under NEPA, we apply the APA's "arbitrary and capricious" standard. See *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 952 (7th Cir. 2003) (citing 5 U.S.C. § 706(2)(A)).

NEPA is a procedural statute, not a substantive one. See *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) ("[I]t is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process."). Thus, in reviewing an agency's compliance with the law, a court's "only role is to ensure that the agency has taken a hard look at environmental consequences" that may flow from a project, not to second-guess the agency's substantive judgment about how serious those consequences might be or what to do about them. See *Env't L. & Pol'y Ctr. v. U.S. Nuclear Regul. Comm'n*, 470 F.3d 676, 682 (7th Cir. 2006).

As we noted above, the National Park Service and Department of Transportation conducted a joint environmental assessment, determined that no EIS was needed for the Obama Presidential Center project, and issued a finding of no significant impact. Protect Our Parks argues that the agencies' decision not to prepare an EIS was arbitrary and capricious, in part because the project requires the City to cut down about 800 trees and felling those trees may adversely affect certain migratory birds, and in part for historic preservation and other reasons noted earlier. But those are arguments about the

---

[3] We cite the regulations in place when the challenged Environmental Assessment was prepared. Since then, the Council on Environmental Quality has twice issued updated NEPA regulations. See 85 Fed. Reg. 43,304 (July 16, 2020); 87 Fed. Reg. 23,453 (Apr. 20, 2022).

agencies' response to the procedural steps they took, not arguments about their failure to adhere to the required process.

In fact, the agencies were very thorough. Their environmental assessment includes, for example, an exhaustive Tree Technical Memorandum, which catalogs the species of the trees that will be cut down and confirms that each tree lost will be replaced by a newly planted tree. The Memorandum concludes that the tree replacement plan will have an "overall neutral" impact and may even improve the park, because dying trees will be replaced with healthy ones. Similarly, the EA includes a detailed discussion of the project's effect on migratory birds. It considers the City's tree replacement plan, the hundreds of acres of Jackson Park that will remain untouched by the project, and the birds' nesting habits. NEPA requires no more: the record shows that the Park Service and Department of Transportation took the necessary hard look at the likely environmental consequences of the project before reaching their decisions.

Protect Our Parks also attempts to recast its substantive objections as procedural ones by arguing that the Park Service and the Department of Transportation did not adequately consider three of the ten factors set forth in the NEPA regulations in effect while the review was underway. See 40 C.F.R. § 1508.27(b) (2019) (listing factors). Whether or not a project "significantly" affects the environment turns on the project's context and the intensity of its effects. *Id.* § 1508.27(a)–(b).

Again, the administrative record amply shows that the agencies "consider[ed] the proper factors," ensuring that their decision is entitled to deference. See *Ind. Forest All.*, 325 F.3d at 859. Protect Our Parks faults the agencies for ignoring the unique characteristics of Jackson Park, see 40 C.F.R.

§ 1508.27(b)(3) (2019), but the record shows otherwise. The environmental assessment did take into account the historical and cultural resources in the park before concluding that the Center's effects will be minimal. Protect Our Parks also contends that the agencies did not consider "[t]he degree to which" environmental harm from the project is "likely to be highly controversial." See *id.* § 1508.27(b)(4). Its evidence of controversy comes from extra-record declarations from neighbors who oppose the project. But the controversy factor is not about whether some neighbors do not support a project. See *Ind. Forest All.*, 325 F.3d at 857 (NEPA does not contain a "heckler's veto"). Rather, an agency must consider whether there are substantial methodological reasons to disagree about the "size, nature, or effect" of a project. *Id.*; see also *Hillsdale Env't Loss Prevention v. U.S. Army Corps. Of Eng'rs*, 702 F.3d 1156, 1181–82 (10th Cir. 2012).

Finally, Protect Our Parks accuses the agencies of failing to consider the "cumulatively significant impact" of the project. See 40 C.F.R. § 1508.27(b)(7) (2019). But the EA did so—it just reached a conclusion with which the plaintiffs disagree, when it determined that the cumulative effects would be "negligible, minor, or otherwise relatively small[.]" The Park Service and the Department of Transportation thoroughly studied the project through the lens of the required regulatory factors before reaching their decision that no environmental impact statement was required. Their conclusion thus "implicates substantial agency expertise and is entitled to deference." *Ind. Forest All.*, 325 F.3d at 859.

B

Protect Our Parks' next theory is that the Park Service and Department of Transportation sidestepped NEPA's reasonable-alternatives requirement by treating the City's decision to locate the Center in Jackson Park as a given. NEPA requires that agencies "study, develop, and describe appropriate alternatives" to major federal projects. 42 U.S.C. § 4332(2)(E); see also 40 C.F.R. § 1502.14 (2019) (agencies must "evaluate all reasonable alternatives" to the proposed action.). Protect Our Parks argues that NEPA required the agencies to evaluate alternative locations for the Center throughout Chicago. It sees the decision not to question the Jackson Park site as a form of "piecemealing or segmentation," which is a practice by which an agency unlawfully dodges its NEPA obligations by breaking up "an overall plan into smaller parts involving action with less significant environmental effects." *Mineta*, 349 F.3d at 962 (internal quotation marks omitted). Protect Our Parks asserts that the Park Service and the Department of Transportation improperly "segmented" two aspects of the overall project: the federal decisions to approve the UPARR conversion and to expand roads, bike lanes, and pedestrian paths; and the City's earlier decision to build the Center in Jackson Park. A proper assessment, Protect Our Parks urges, would also have examined a site in nearby Washington Park, about two miles to the west of Jackson Park.

The argument is fatally flawed for three reasons. First, NEPA reaches only major federal actions, not actions of non-federal actors. 42 U.S.C. § 4332(2)(C); see 40 C.F.R. § 1508.8 (2019) (defining "major Federal actions" as those "potentially subject to Federal control and responsibility."). As we stressed

earlier, it was the City, not the federal government, that se-
lected Jackson Park as the site of the Obama Presidential Cen-
ter. The Supreme Court has stated that "where an agency has
no ability to prevent a certain effect due to its limited statutory
authority over the relevant actions, the agency cannot be con-
sidered a legally relevant 'cause' of the effect." *Public Citizen*,
541 U.S. at 770. That describes this situation. The Center was
not a federal project, and no federal agency had the authority
to dictate to the Obama Foundation where the Center would
be located. Agencies have no obligation to examine the effects
of state and local government action that lies beyond the fed-
eral government's control. It follows that it was proper for the
Park Service and the Department to confine their analysis to
the portions of the project that are subject to federal review.

That brings us to causation. NEPA requires agencies to
consider only environmental harms that are both factually
and proximately caused by a relevant federal action. See *id.* at
767. We accept for present purposes the fact that the Park Ser-
vice's approval was a but-for cause of the Center's placement
in Jackson Park, in that the City could not move forward with
construction without it. The problem is that but-for causation
alone "is insufficient to make an agency responsible for a par-
ticular effect under NEPA and the relevant regulations." *Id.*
Rather, an agency is on the hook only for the decisions that it
has the authority to make. See *id.* at 768–70 (holding that an
agency's trucking-safety regulations were not a proximate
cause of new applications by Mexican motor carriers to oper-
ate in the United States when the agency lacked authority to
block those applications); see also *Sauk Prairie Conservation
All. v. Dep't of the Interior*, 944 F.3d 664, 680 (7th Cir. 2019)
(holding that the Park Service's decision to permit helicopter

training was not a proximate cause of the training's environmental harms, "[b]ecause the National Park Service had no authority to end the helicopter training"). Here, the federal government has no authority to choose another site for the Center or to force the City to move the Center, and so no federal action was a proximate cause of any environmental harms resulting from the choice of Jackson Park. See *Scottsdale Mall v. Indiana*, 549 F.2d 484, 488 (7th Cir. 1977) (explaining that NEPA "does not infringe on the right of a state to select a project to be financed solely out of its own funds").

Although federal agencies' limited role in the project would be enough to defeat causation on its own, our conclusion is further bolstered by the mandatory language of the UPARR Act. 54 U.S.C. § 200507 says that NPS "shall" approve conversions of parkland so long as a local government's proposal meets statutory criteria. Because the agency found that Chicago's plan did so, it was obligated to approve the conversion. See *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320–21 (2020) ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.'").

Third, Protect Our Parks ignores the "reasonable" half of the reasonable-alternatives requirement. See 40 C.F.R. § 1502.14 (2019); see also *Mineta*, 349 F.3d at 960. It would be unreasonable to require agencies to spend time and taxpayer dollars exploring alternatives that would be impossible for the agency to implement. See *Public Citizen*, 541 U.S. at 765; *Latin Americans for Soc. & Econ. Dev. v. Fed. Highway Admin.*, 756 F.3d 447, 470 (6th Cir. 2014). It would be unreasonable to force an agency to consider alternatives that would frustrate

the project's goals. See *Mineta*, 349 F.3d at 960–61; see also *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991).

C

Most of Protect Our Parks' remaining arguments suffer from the same causation, scope of federal action, and deference problems as the NEPA claims we already have discussed. Each of the following points is a variation on the plaintiffs' theme that the agencies should have considered locations for the Center outside Jackson Park.

Their argument under section 4(f) of the Department of Transportation Act offers a good example. Under that statute, the Department may approve a "transportation program or project" in a public park only if "(1) there is no prudent and feasible alternative to using the land; and (2) the program or project includes all possible planning to minimize harm to the park[.]" 49 U.S.C. § 303(c). Protect Our Parks faults the Highway Administration for not evaluating alternative locations for the Center. This argument is no more likely to succeed under section 4(f) than under NEPA. No federal law prohibited the City from building the Center in Jackson Park and closing roadways in connection with the project. See *Old Town*, 333 F.3d at 736 ("Entities that proceed on their own dime need not meet conditions for federal assistance or approval."). Because the Highway Administration could not have compelled the City to locate the Center at a different site, it was neither arbitrary nor capricious for that agency to take the City's decision to build the Center in Jackson Park as a given—not to mention the fact that choosing a site for and building the Center is not a transportation project.

Likewise, the UPARR Act claim turns on the theory that the Park Service should have considered alternative locations for the Center. The Act requires that the Park Service consider whether a proposal to convert parkland supported by a UPARR grant evaluated "[a]ll practical alternatives to the proposed conversion." 36 C.F.R. § 72.72(b)(1). Again, the Park Service has no authority to force the City to move the Center to a different location, and so its approval is not a proximate cause of the City's plans. In any case, the Park Service evaluated the City's UPARR conversion proposal, found that the City had considered practical alternatives, and explained that no practical alternatives existed in light of the City's goals. By doing so, the Park Service satisfied its statutory obligations.

Under section 106 of the National Historic Preservation Act (NHPA), agencies must "take into account the effect of the[ir] undertaking[s] on any historic property." 54 U.S.C. § 306108. Agencies must make reasonable efforts to identify historic properties affected by federal actions and, with the input of consulting parties, "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects" on those historic properties. See 36 C.F.R. § 800.4-800.6. Like NEPA, the NHPA is a purely procedural statute. See *Nat'l Mining Ass'n v. Fowler*, 324 F.3d 752, 755 (D.C. Cir. 2003). Because the Highway Administration followed the procedure required by the NHPA, the agency's conclusions are entitled to deference. We add, for the sake of completeness, that the NHPA (like NEPA and section 4(f)) applies only to projects that require federal approval. See *Old Town*, 333 F.3d at 735–36.

In a final variation of the same argument, Protect Our Parks urges us to revoke the Army Corps of Engineers' permits, which were issued under the Clean Water Act and Rivers and Harbors Act, because (once again) of the failure to consider alternative locations for the Center. This argument fails for the same reasons it failed under NEPA, the NHPA, the DOTA, and UPARR. The Corps had no control over the City's decision to build the Center in Jackson Park and no authority to force the City to pick a different site.

D

Finally, Protect Our Parks brought an anticipatory demolition claim under section 110(k) of the National Historic Preservation Act. Section 110(k) of the NHPA bars federal agencies from issuing a permit or other assistance to applicants who "intentionally significantly adversely affected a historic property to which the grant would relate" with "intent to avoid the requirements" of the NHPA. 54 U.S.C. § 306113. But the statute includes an exception when the agency "determines that circumstances justify granting the assistance." *Id.*

In 2018, the City began clearing trees in Jackson Park in preparation for the construction of a new track-and-field complex. When the Highway Administration learned about the tree clearing, it requested a written explanation from the City. The City explained that the Obama Foundation had donated funds to build a new track for the community, but that the track lay outside the proposed grounds of the Obama Presidential Center, that the funds came with no conditions related to the Center, and that the City had consulted with the Park Service, which assured the City that the track-and-field pro-

ject was not subject to federal review. The Highway Administration investigated further and determined that the track should factor into the federal government's section 106 and NEPA review, but that the City never acted *with the intent* to avoid section 106's requirements. Protect Our Parks has not pointed to any evidence to undermine those conclusions, nor has it provided evidence that the City intended to avoid the NHPA's requirements, and so it cannot prevail on its anticipatory-demolition claim.

In a last-ditch effort, Protect Our Parks argues that the district court abused its discretion by not holding an evidentiary hearing about several declarants' statements that are not in the administrative record. Judicial review in APA actions is typically confined to the administrative record, with several exceptions not relevant here. See *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573–74. Because Protect Our Parks has not even attempted to make a "strong showing" that any exception to the general rule applies in this case, we limit our review to the ample administrative record and reject the call to supplement that record through an evidentiary hearing. *Id.*

## III

We AFFIRM the district court's order denying plaintiffs' motion for a preliminary injunction.