In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 22-2835

BARBARA TULLY, *et al.*,

*Plaintiffs-Appellants*,

*v.*

PAUL OKESON, *et al.*,

*Defendants-Appellees*.

———————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:20-cv-01271 — **James P. Hanlon**, *Judge*.

———————

ARGUED MAY 17, 2023 — DECIDED AUGUST 15, 2023

———————

Before RIPPLE, SCUDDER, and LEE, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Indiana law allows "elderly" voters—those sixty-five or older—to vote by mail. Indiana voters who are younger than sixty-five must fall within one of twelve other categories in order to vote by mail. Because of the COVID-19 pandemic, the Indiana Election Commission extended absentee-voting privileges to all registered Indiana voters for the June 2020 primary but did not renew that order for the November 2020 general election.

The plaintiffs are Indiana voters who were allowed to vote absentee in the primary, but who do not otherwise qualify for absentee voting. They initially sought a preliminary injunction requiring Indiana to permit unlimited absentee voting, claiming that the State's failure to extend absentee voting to all eligible voters abridged the rights of younger voters in violation of the Twenty-Sixth Amendment and also infringed their fundamental right to vote in violation of the Equal Protection Clause of the Fourteenth Amendment.[1] The district court denied their request for a preliminary injunction.

We heard the plaintiffs' appeal less than six weeks before the 2020 general election, and after absentee voting already had begun. Mindful of the Supreme Court's admonition "to exercise caution and restraint before upending state election regulations on the eve of an election," we affirmed the denial of a preliminary injunction. *Tully v. Okeson*, 977 F.3d 608, 611–12 (7th Cir. 2020) ("*Tully I*") (citing *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)). Relevant to the present appeal, we concluded that the plaintiffs had not made a strong showing of likelihood of success on the merits in light of *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969), which held that "'the right to vote' does not include Plaintiffs' 'claimed right to receive absentee ballots.'" *Tully I*, 977 F.3d at 613 (quoting *McDonald*, 394 U.S. at 807).

Back in the district court, the plaintiffs abandoned their Fourteenth Amendment claim, and both parties moved for summary judgment. The district court concluded that *Tully I* established the law of the case, and that even if the law of the

---

[1] The plaintiffs named the individual members of the Indiana Election Commission, as well as the Indiana Secretary of State, as defendants.

case doctrine did not apply, our decision constituted controlling authority. The plaintiffs again sought review.

We now affirm the district court's judgment, but on different grounds. Given the circumstances under which we issued *Tully I*, that decision does not constitute the law of the case; nor do we consider ourselves bound by its reasoning. Considering the merits anew, however, we hold that Indiana's granting the opportunity to vote by mail to elderly voters does not abridge the right to vote of those under sixty-five. The provision does not violate the Twenty- Sixth Amendment.

## I.

## BACKGROUND

Indiana law allows thirteen categories of voters to vote by mail. Ind. Code § 3-11-10-24. These categories include voters working the polls; voters confined in a hospital or other health care facility; voters with disabilities; voters who are caregivers; voters who do not have transportation to the polls; and voters who are "elderly," among others. *See id*. For purposes of Indiana's voting regulations, "'[e]lderly' means a voter who is at least sixty-five (65) years of age." *Id.* § 3-5-2-16.5.

Because of the COVID-19 pandemic, the Indiana Election Commission extended absentee-voting privileges to all registered Indiana voters for the June 2020 primary. For the November general election, however, the Commission did not renew its order. Instead, it sought to alleviate the effects of COVID-19 by implementing extensive safety protocols, issuing protective equipment for election day, and allowing voters in all counties to vote during a twenty-eight-day period before the election.

The plaintiffs, voters in Indiana who were allowed to vote absentee in the primary but did not otherwise qualify for absentee voting in the general election, brought this action. Initially, they sought a preliminary injunction requiring Indiana to permit unlimited absentee voting in the general election. They asserted that the State's extension of absentee-voting rights to voters over sixty-five years of age abridged the rights of younger voters in violation of the Twenty-Sixth Amendment. Second, they contended that requiring some voters to vote in person during the pandemic infringed their fundamental right to vote in violation of the Equal Protection Clause of the Fourteenth Amendment. The district court denied their request for a preliminary injunction, and we affirmed that decision. *Tully v. Okeson*, 977 F.3d 608 (7th Cir. 2020).

In affirming the district court's denial of a preliminary injunction, the panel majority concluded that the plaintiffs had not made a strong showing of likelihood of success on the merits because "'the right to vote' does not include Plaintiffs' 'claimed right to receive absentee ballots.'" *Id.* at 613. The panel's decision relied on *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969). In that case, pretrial detainees in Illinois had argued that the State's voting laws violated the Equal Protection Clause because it granted the right to vote absentee to voters who were "physically incapacitated," but did not make the same provision for those who were "judicially incapacitated." *Id.* at 805. The Court rejected that argument, explaining that at issue was "a claimed right to receive absentee ballots," not the right to vote. *Id.* at 807. Given this conclusion, the panel majority in *Tully I* similarly concluded that Indiana's absentee-voting rules did not impact

the plaintiffs' right to vote and therefore did not implicate the Twenty-Sixth Amendment.[2]

In reaching this decision, the panel majority was "guide[d]" by "[t]wo other principles." *Tully I*, 977 F.3d at 611. First, it noted that "the Constitution explicitly grants states the authority to prescribe the manner of holding federal elections." *Id.* "Second, the Supreme Court's *Purcell* principle counsels federal courts to exercise caution and restraint before upending state election regulation on the eve of an election." *Id.* at 611–12. Because voting already was underway when the case was heard, the panel was "wary of turning the State in a new direction at this late stage." *Id.* at 612.

The concurring judge agreed that the plaintiffs had "made a weak case" that their right to vote had been abridged on the basis of age. *Id.* at 619 (Ripple, J., concurring). The definition of the elderly as sixty-five years or older was "a common-sense tool" that "relieve[d] the Commission of the insurmountable task of adjudicating … which of its older citizens would be deterred in coming to the polls on a November day because of the physical and social conditions that invariably afflict senior citizens." *Id.* The concurring judge specifically noted that "[a] November day in Indiana, at least in the northern regions of the State, can pose a significant obstacle to leaving one's home." *Id.* The concurrence also expressed a wariness of using *McDonald*'s definition of the right to vote in all circumstances, explaining: "*McDonald* antedates the

---

[2] The only issue in the current appeal is whether Indiana's extension of absentee voting to "elderly" voters violates the Twenty-Sixth Amendment; therefore, the discussion of prior proceedings is limited to that issue as well.

ratification of this Amendment, however, and it may well be that the day will come when the general rule articulated in *McDonald* will have to yield to the Twenty-Sixth Amendment when the values protected by that Amendment are clearly at stake." *Id.*

Back in the district court, both parties moved for summary judgment. The district court determined that the panel's decision on the preliminary injunction established the law of the case, and that, in any event, it was bound by the panel's decision. It acknowledged that the opinion concerned only the question of whether a preliminary injunction should issue, and that decisions in the preliminary-injunction context did not necessarily implicate the law of the case. Nevertheless, the district court interpreted the majority decision as resting on a purely legal determination. Because the applicable law had not changed since the issuance of the panel's opinion, it could not deviate from *Tully I*. The district court therefore granted summary judgment to the State defendants on the ground that the absentee-ballot provision did not violate the Twenty-Sixth Amendment. The plaintiffs timely appealed.

## II.

## DISCUSSION

### A. Law of the Case

The State first maintains that the law of the case precludes us from revisiting our decision in *Tully I*. "The law of the case doctrine 'is a rule of practice, based on [the] sound policy … that, when an issue is once litigated and decided, that should be the end of the matter.'" *Creek v. Vill. of Westhaven*, 144 F.3d 441, 445 (7th Cir. 1998) (quoting *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 532 (7th Cir. 1982)). "The consistency provided by

the rule protects parties from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action." *Id.* (internal quotation marks omitted). "This doctrine advises against revisiting earlier rulings 'absent a compelling reason, such as manifest error or a change in the law.'" *Toliver v. Pollard*, 688 F.3d 853, 861 (7th Cir. 2012) (quoting *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007)).

Here, it would not be "sound policy" to invoke the law of the case doctrine. *Tully I* concerned the issuance of a preliminary injunction. The Supreme Court has held that legal and factual rulings made as part of a preliminary-injunction analysis are not binding upon panels when they later consider the matter on the merits. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The Court has explained that

> [t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing[,] and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.
>
> …

> [W]here a federal district court has granted a preliminary injunction, the parties generally will have had the benefit neither of a full opportunity to present their cases nor of a final judicial decision based on the actual merits of the controversy. Thus when the injunctive aspects of a case become moot on appeal of a preliminary injunction, any issue preserved by an injunction bond can generally not be resolved on appeal, but must be resolved in a trial on the merits.

*Id.* at 395–96 (citations omitted).

Although *Camenisch* was not speaking directly to the contours of the law of the case doctrine, the factors identified by the Court—a less-than-developed record, a short timeline, and a concomitant truncated legal analysis—usually counsel against invoking the law of the case doctrine in a way that would preclude a full merits determination. *See* 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478.5 (3d ed. 2019) ("Rulings—predictions—as to the likely outcome on the merits made for preliminary injunction purposes do not ordinarily establish the law of the case, whether the ruling is made by a trial court or by an appellate court."). Of course, this general rule does not apply to "[a] fully considered appellate ruling on an issue of law made on a preliminary injunction appeal." *Id.*; *see also Fish v. Schwab*, 957 F.3d 1105, 1141 (10th Cir. 2020) (using this guiding principle to determine that a preliminary-injunction

analysis was law of the case); *Howe v. City of Akron*, 801 F.3d 718, 740 (6th Cir. 2015) (same and collecting cases).[3]

Here, although *Tully I* rested on a point of law, it also was made on the eve of the 2020 election. As we noted in *Tully I*, voting already was underway when we heard oral arguments on September 30, 2020. We were cognizant of the fact that any changes in voting methods would place additional burdens on State resources already taxed due to COVID-19. Even more importantly, last-minute changes in voting rules could have confused the electorate. Our ultimate decision was animated by these weighty concerns—ones the Supreme Court has authorized, and encouraged, us to consider. *Purcell*, 549 U.S. at 4–5. However, at this point, the election has passed, and our decision will neither strain the electoral system nor jeopardize the integrity of the electoral process. We therefore now examine more critically the issue for decision.

## B. Abridgement of the Right to Vote

The Twenty-Sixth Amendment provides that "[t]he right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age." U.S. Const. amend. XXVI, § 1. Here, the plaintiffs do not allege that any citizens of Indiana were denied their right to vote. Rather, their claim is that the right to vote of those under sixty-five was abridged. We focus therefore on when there is an "abridgement" of "the right to vote" for purposes of the Twenty-Sixth Amendment.

---

[3] Moreover, on at least one occasion, this court has followed a preliminary-injunction analysis as law of the case. *See Pearson v. Thompson*, No. 89-3248, 1992 WL 25349, at *2 (7th Cir. Feb. 13, 1992).

**1.**

In answering this question, we are, as our colleagues in the Fifth Circuit have observed, working, in essence, on a constitutional blank slate. *See Texas Democratic Party v. Abbott*, 978 F.3d 168, 183 (5th Cir. 2020) (noting that the Twenty-Sixth Amendment "has yet to be interpreted in any significant depth"). The Supreme Court has not addressed the definition of the right to vote in the context of the Twenty-Sixth Amendment.

The plaintiffs start by inviting our attention to the language of the Twenty-Sixth Amendment and note that it mirrors the language employed in the Fifteenth[4] and Twenty-Fourth Amendments.[5] The cases interpreting those Amendments, the plaintiffs submit, therefore should guide our interpretation of the identical language of the Twenty-Sixth Amendment. According to the plaintiffs, the plain language

---

[4] Section 1 of the Fifteenth Amendment states: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude … ."

[5] The Twenty-Fourth Amendment provides in relevant part: "The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax."

The Nineteenth Amendment also employs the same language. *See* U.S. Const. amend. XIX ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex."). However, as with the Twenty-Sixth Amendment, there is a dearth of case law interpreting the Nineteenth Amendment.

of the Fifteenth Amendment, and by extension the Twenty-Sixth Amendment, "has been understood to 'secure[] freedom from discrimination' in all 'matters affecting the franchise.'" This broad understanding of the right to vote, the plaintiffs insist, encompasses absentee voting.

We agree with the plaintiffs that the Supreme Court's interpretation of the equivalent language in the Fifteenth and Twenty-Fourth Amendments is a good starting place for our analysis. However, to reach the plaintiffs' endpoint—that the Amendment must be read as requiring *no* distinction on the basis of age in *any* matter related to voting—we must ignore the understanding of the right to vote at the time of the Twenty-Sixth Amendment's ratification.

We begin with some foundational principles. Although an immediate purpose for the enactment of the Twenty-Sixth Amendment was to lower the voting age in state and local elections to eighteen, the language of the Amendment "transcend[s] the particular controversy which was the immediate impetus for its enactment." *Rice v. Cayetano*, 528 U.S. 495, 512 (2000). As with the Fifteenth, Nineteenth, and Twenty-Fourth Amendments, the Twenty-Sixth Amendment "provide[s] an individual right to be free from the denial or abridgement of the right to vote based on the classification described in the Amendment." *Abbott*, 978 F.3d at 184. Thus, "the Twenty-Sixth Amendment confers an individual right to be free from the denial or abridgment of the right to vote on account of age." *Id.*

To determine the contours of that right, we look first at the language of the Amendment and the way that language was understood at the time the Twenty-Sixth Amendment was adopted. *See District of Columbia v. Heller*, 554 U.S. 570, 579–95

(2008) (reviewing how the terms of the Second Amendment
were understood at the time of ratification). At the time the
Twenty-Sixth Amendment was ratified, "[i]n-person voting
was the rule, absentee voting the exception." *Abbott*, 978 F.3d
at 188. Indeed, the Supreme Court's decision in *McDonald v.
Board of Election of Commissioners of Chicago*, 394 U.S. 802, 807
(1969), handed down only two years before the Twenty-Sixth
Amendment was ratified, clearly distinguishes the right to
vote from "a claimed right to receive absentee ballots." As we
have explained, *McDonald* involved a class of pretrial detain-
ees at the Cook County jail who were unable to vote absentee
because they were not "physically incapacitated." *Id.* at 805.
They brought an action claiming that the distinction between
those who were "physically incapacitated" and "judicially in-
capacitated" violated the Equal Protection Clause. *See id.* The
Court initially considered the level of scrutiny that should be
applied and noted that,

> while the "States have long been held to have
> broad powers to determine the conditions un-
> der which the right of suffrage may be exer-
> cised," we have held that once the States grant
> the franchise, they must not do so in a discrimi-
> natory manner. More importantly, however, we
> have held that because of the overriding im-
> portance of voting rights, classifications "which
> might invade or restrain them must be closely
> scrutinized and carefully confined" where those
> rights are asserted under the Equal Protection
> Clause. And a careful examination on our part
> is especially warranted where lines are drawn
> on the basis of wealth or race, two factors which
> would independently render a classification

>   highly suspect and thereby demand a more ex-
>   acting judicial scrutiny.

*Id.* at 807 (citations omitted). However, the Court did not have to apply "[s]uch an exacting approach" because the absentee ballot provisions had not been drawn on the basis of a suspect category, nor did they "ha[ve] an impact on appellants' ability to exercise the fundamental right to vote." *Id.* The Court explained that it was "not the right to vote that [wa]s at stake" but rather "a claimed right to receive absentee ballots." *Id.* The Court specifically noted that "the record [wa]s barren of any indication that the State might not … possibly furnish the jails with special polling booths or facilities on election day, or provide guarded transportation to the polls themselves for certain inmates." *Id.* at 808 n.6.

*McDonald*'s conception of "the right to vote" as the *effective* exercise of the franchise is also consistent with the Court's interpretations of the right to vote under the Fifteenth Amendment. *Lane v. Wilson*, 307 U.S. 268 (1939), is a case in point. *Lane* involved concerted efforts by the Oklahoma legislature to deny its black citizens the right to vote. Initially, the Oklahoma legislature imposed a literacy test for voting "from which white voters were in effect relieved through the operation of a 'grandfather clause.'" *Id.* at 269. The Court struck this provision in 1915. *See Guinn v. United States*, 238 U.S. 347 (1915). To try to minimize the effects of the *Guinn* decision, the Oklahoma legislature passed a law that automatically registered individuals who had voted in the election of 1914 (while the discriminatory literacy law was in effect) but required any new voter to register within a twelve-day time frame in 1916 or forever lose their right to vote. In 1934, a black voter, who, by operation of the statute, had

"permanently lost the right to register and hence the right to vote," challenged this statutory scheme. *Lane*, 307 U.S. at 271. Noting that "[t]he Fifteenth Amendment secures freedom from discrimination on account of race in matters affecting the franchise," *id.* at 274, the Court concluded that the legislature's efforts to preclude black citizens from registering—and therefore voting—violated the Amendment.

Similarly, *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), involved a facial challenge to the Voting Rights Act of 1965. In considering whether the Fifteenth Amendment provided authority for Congressional action, the Court stated:

> Section 1 of the Fifteenth Amendment declares that "(t)he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." This declaration has always been treated as self-executing and has repeatedly been construed, without further legislative specification, *to invalidate state voting qualifications or procedures which are discriminatory on their face or in practice.*

*Id.* at 325 (emphasis added). The Court then listed a number of cases, which concerned registration, physical casting of ballots, or disenfranchisement through district line drawing. *See, e.g., id.* (citing, among other cases, *Lane*, 307 U.S. at 274; *Smith v. Allwright*, 321 U.S. 649 (1944) (addressing denial of right to cast a ballot in a primary election); *Gommillion v. Lightfoot*, 364 U.S. 339 (1960) (addressing the redrawing of municipal boundaries to exclude minority voters)). After listing these examples of "state voting qualifications or procedures which are discriminatory on their face or in practice," the Court in

*Katzenbach* reaffirmed that "States have broad powers to de-termine the conditions under which the right of suffrage may be exercised." 383 U.S. at 325 (internal quotation marks omit-ted). Thus, when referencing "state voting qualifications or procedures which are discriminatory on their face or in prac-tice," the Court was focused on the right to register, the right to cast a ballot, and the right to have that ballot counted. It was not concerned with peripheral matters typically left to the States.

While the Court's Fifteenth Amendment cases shed light on the nature of "the right to vote," the Court's seminal Twenty-Fourth Amendment case helps us understand the term "abridge." In *Harman v. Forssenius*, 380 U.S. 528 (1965), the Court considered the constitutionality of a Virginia law that required qualified citizens to either pay a poll tax or file an annual certificate of residence in order to vote. The Court had little difficulty in concluding that this choice violated the Twenty-Fourth Amendment's absolute ban of the poll tax. The Court explained that

> [i]t has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution. … Signif-icantly, the Twenty-fourth Amendment does not merely insure that the franchise shall not be "denied" by reason of failure to pay the poll tax; it expressly guarantees that the right to vote shall not be "denied or abridged" for that rea-son.

*Id*. at 540 (citation omitted). In explaining when the right is "abridged," the Court stated that, "like the Fifteenth Amend-ment, the Twenty-fourth 'nullifies sophisticated as well as

simple-minded modes' of impairing the right guaranteed." *Id.* at 540–41. Specifically, "[i]t hits *onerous procedural requirements* which *effectively handicap* exercise of the franchise by those claiming the constitutional immunity." *Id.* at 541 (internal quotation marks and citations omitted) (emphasis added). Thus, the Court continued, to demonstrate the law's invalidity, the plaintiffs only needed to "show[] that it imposes a *material requirement* solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax." *Id.* (emphasis added).

The Court went on to describe how the certification requirement "erect[ed] a real obstacle to voting in federal elections." *Id.* Specifically, those who opted not to pay the tax had to

> file in each election year, within a stated interval ending six months before the election, a notarized or witnessed certificate attesting that they have been continuous residents of the State since the date of registration (which might have been many years before under Virginia's system of permanent registration) and that they do not presently intend to leave the city or county in which they reside prior to the forthcoming election.

*Id.* "In effect," the certification "amount[ed] to annual re-registration which Virginia officials have sharply contrasted with the 'simple' poll tax system." *Id.* at 542. Based on this evidence, the Court was "constrained to hold that the requirement imposed upon the voter who refuses to pay the poll tax constitutes an abridgment of his right to vote by reason of failure to pay the poll tax." *Id.*

The Court did note that the alternative need not be as onerous as the certification requirement: "The requirement imposed upon those who reject the poll tax method of qualifying would not be saved even if it could be said that it is no more onerous, or even somewhat less onerous, than the poll tax." *Id.* The plaintiffs seize on this language as suggesting that *any* imposition—however minor—is constitutionally prohibited. But context is key. The sentences immediately following state: "For federal elections, the poll tax is abolished absolutely as a prerequisite to voting, and no equivalent or milder substitute may be imposed. *Any material requirement* imposed upon the federal voter solely because of his refusal to waive the constitutional immunity subverts the effectiveness of the Twenty-fourth Amendment and must fall under its ban." *Id.* (emphasis added). In short, the Court is clear that an "abridgement" must involve the imposition of a "material requirement."

The plaintiffs urge that this interpretation of abridgement cannot be reconciled with the Court's later pronouncements in *Reno v. Bossier Parish School Board*, 528 U.S. 320, 333–34 (2000). In *Bossier Parish*, the Court considered "the question whether § 5 of the Voting Rights Act of 1965, … 42 U.S.C. § 1973c, prohibits preclearance of a redistricting plan enacted with a discriminatory but nonretrogressive purpose." 528 U.S. at 322–23.[6] The Court first reiterated that the meaning of "'abridging the right to vote on account of race or color' refers only to retrogression in § 5." *Id.* at 333. It stated:

> The term "abridge," however—whose core meaning is "shorten," *see* Webster's New International Dictionary 7 (2d ed.1950); American

---

[6] This provision has been moved to 52 U.S.C. § 10304.

> Heritage Dictionary 6 (3d ed.1992)—necessarily entails a comparison. It makes no sense to suggest that a voting practice "abridges" the right to vote without some baseline with which to compare the practice. In § 5 preclearance proceedings—which uniquely deal only and specifically with *changes* in voting procedures—the baseline is the status quo that is proposed to be changed: If the change "abridges the right to vote" relative to the status quo, preclearance is denied, and the status quo (however discriminatory *it* may be) remains in effect.

*Id.* at 333–34. However, this was not the case with proceedings under § 2 of the Voting Rights Act or the Fifteenth Amendment:

> In § 2 or Fifteenth Amendment proceedings, by contrast, which involve not only changes but (much more commonly) the status quo itself, the comparison must be made with a hypothetical alternative: If the *status quo* "results in [an] abridgement of the right to vote" or "abridge[s] [the right to vote]" relative to what the right to vote *ought to be*, the status quo itself must be changed. Our reading of "abridging" as referring only to retrogression in § 5, but to discrimination more generally in § 2 and the Fifteenth Amendment, is faithful to the differing contexts in which the term is used.

*Id.* at 334.

Based on this distinction, the plaintiffs maintain that, for purposes of the Fifteenth Amendment (and by extension the Twenty-Sixth Amendment), "abridge" must be something more than "retrogression" as that term is used in § 5.[7] We certainly agree with the plaintiffs in principle. Whether section 3-11-10-24(a)(5) of the Indiana Code has a retrogressive effect, i.e., whether it renders the Plaintiffs "worse off," is *not* the equivalent of asking whether their right to vote has been abridged. Focusing just on retrogression for purposes of the Fifteenth Amendment would preclude relief to individuals who, even before the passing of the act in question, had not enjoyed fully the right to vote. As the Court in *Bossier Parish* explained, in order to determine whether the Fifteenth Amendment has been violated, the question is whether the right to vote—as it was intended to be exercised—has been abridged. *Bossier Parish* therefore sets the starting point for determining whether an "abridgement" has occurred as that

---

[7] In their brief, the plaintiffs rely heavily on cases interpreting § 2 of the Voting Rights Act. However, the Voting Rights Act does not employ the same language as the Twenty-Sixth Amendment. *See Allen v. Milligan*, 143 S. Ct. 1487, 1499–1501 (2023) (tracking the history of the Voting Rights Act from its origins when it "closely tracked the language of the [Fifteenth] Amendment" to the adoption of the "effects" test in 1982). Moreover, the Court has made it clear that "abridgement" for purposes of § 2 has no application outside of the context of the Voting Rights Act. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2337 (2021) (stating that "[w]e need not decide" what "to deny or abridge the right … to vote on account of race or color" "would mean if it stood alone because § 2(b) … explains what must be shown to establish a § 2 violation"). Therefore, to the extent § 2 cases speak directly to the Fifteenth Amendment, as in *Bossier Parish*, they provide guidance for our interpretation of the Twenty-Sixth Amendment. They are not otherwise helpful in resolving the issue currently before us.

term was used in *Harman*. That starting point is the right to vote, which may or may not be secured by the status quo of state law.

With this understanding of "abridgement" and "right to vote," we turn to the facts of the present case.

**2.**

Indiana provides myriad ways for registered voters to exercise their right to vote. They may cast ballots in person at their precinct polling places on election day. Ind. Code § 3-11-8-2. They also may cast their ballots in person at various locations for the twenty-eight days prior to election day. *Id.* §§ 3-11-4-1, 3-11-10-26. Additionally, voters who cannot vote in person on election day due to "illness or injury," caring for someone at a private residence, or disability, may vote via a travelling voter board, which will bring a ballot to the voter's house and then return it for counting. *Id.* § 3-11-10-25. Finally, Indiana allows mail-in voting for voters who fall into specific categories. *See id.* § 3-11-10-24(a)–(b). These include: individuals who have "a specific, reasonable expectation of being absent from the county on election day during the entire twelve (12) hours that the polls are open"; individuals scheduled to "work … during the entire twelve (12) hours that the polls are open"; individuals "confined on election day … because of an illness or injury during the entire twelve (12) hours that the polls are open"; individuals who are disabled; and individuals who are "elderly," among others. *Id.*

Even a cursory reading of Indiana's voting laws reveals full protections of the right to vote for all registered voters. Not only may all voters vote in person in their precinct on election day, but for twenty-eight days prior to the election,

they also may vote at various other locations. Provisions are made for those who are physically unable to get to the polls, and those who care for them. Absentee voting is available for individuals who, because of vocation, occupation, or physical condition, cannot get to the polls on election day. Indiana has included "elderly" voters among this group—and with good reason. It represents a sound legislative judgment that these individuals encounter special barriers in exercising their right to vote. Eliminating those barriers hardly creates a material burden on the exercise of the franchise by other citizens.

Indiana imposes no requirements, much less *material* requirements, on the exercise of the franchise through this accommodation of the elderly. The extension of absentee voting to the elderly does not impose any unconstitutional burden on the right of those under sixty-five to exercise the franchise.[8] Consequently, there is no abridgement as that term is understood in the Supreme Court's case law.

### Conclusion

For the reasons set forth in this opinion, Indiana's extension of absentee voting to "elderly" voters does not violate the Twenty-Sixth Amendment. The judgment of the district court is therefore affirmed.

AFFIRMED

---

[8] In *Texas Democratic Party v. Abbott*, 978 F.3d 168, 192 (5th Cir. 2020), the Fifth Circuit similarly concluded that "the Texas Legislature's conferring a privilege to those at least age 65 to vote absentee did not deny or abridge younger voters' rights"; however, it reached that conclusion by way of an alternate analytical path.

LEE, *Circuit Judge*, concurring in part and dissenting in part. I find much to agree with in the majority opinion. First, I concur with my respected colleagues that the law of the case doctrine does not apply to *Tully I* in light of the particular circumstances of the case at that time. This is particularly true given that my colleagues were on the panel that issued that opinion.

Second, I also agree with the majority opinion's thorough articulation of the legal principles underlying appellants' Twenty-Sixth Amendment claim. In particular, I agree with the majority's observation that the constitutional "right to vote," as discussed in the Supreme Court's decisions in *McDonald*, *Lane*, and *Katzenbach*, encompasses the right to the "*effective* exercise of the franchise," including "the right to register, the right to cast a ballot, and the right to have that ballot counted." Maj. Op. at 13–15. I believe that this correctly construes *McDonald* in the context of the Twenty-Sixth Amendment (which postdates *McDonald*) and the other voting rights amendments. *See Tully v. Okeson*, 977 F.3d 608, 619 (7th Cir. 2020) (Ripple, J., concurring) (observing that "it may well be that the day will come when the general rule articulated in *McDonald* will have to yield to the Twenty-Sixth Amendment when the values protected by that Amendment are clearly at stake").

Third, I also join the majority in rejecting appellants' contention that *every* age-based distinction in voting procedures constitutes an "abridgment" of the right to vote within the meaning of the Twenty-Sixth Amendment. As the majority opinion rightly notes, only those requirements that materially restrict one's right to vote may be constitutionally suspect. *See Harman v. Forssenius*, 380 U.S. 528, 541 (1965) (noting that, like

the Fifteenth Amendment, the Twenty-Fourth "hits onerous procedural requirements which effectively handicap exercise of the franchise") (quoting *Lane v. Wilson*, 307 U.S. 268, 275 (1939)).

Finally, I concur with the majority opinion's rejection of appellees' argument that a voting law can only "abridge" the Twenty-Sixth Amendment right to vote if it is "retrogressive," *i.e.*, it renders some voters "worse off" in their ability to exercise the franchise as compared to the status quo. Maj. Op. at 19. As the majority acknowledges, the "starting point" from which to measure an abridgment is "the right to vote, which may or may not be secured by the status quo of state law." *Id.* at 20; *see Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 334 (2000) ("If the *status quo* results in an abridgement of the right to vote or abridges the right to vote relative to what the right to vote *ought to be*, the status quo itself must be changed.") (cleaned up); *cf. Tex. Democratic Party v. Abbott*, 978 F.3d 168, 190–91 (5th Cir. 2020) (holding that an abridgment only exists if a law makes voting "*more difficult*" for a person than it was before the law was enacted).

In sum, the way I understand the majority opinion, we hold today that a voting law abridges the Twenty-Sixth Amendment right to vote if, on the basis of age, it imposes a materially onerous requirement that effectively handicaps an individual's right to exercise the franchise. Furthermore, a law may abridge the right to vote even if it does not render anyone "worse off" but only makes it easier for some groups (in this case, the elderly) to vote. I agree with all of this.

I part ways with the majority opinion in a small but significant way. Rather than decide now, as a matter of law, that the statute in question does not impose a materially onerous

requirement upon non-elderly voters under *Harman*, I would remand this case to the district court so that the parties may further develop the factual record based upon the standard we articulate today.

It is undisputed that some Indiana voters—including appellants—are prohibited from voting absentee and are required to cast their ballots in person, solely because of their age. I am unprepared to declare that appellants cannot possibly prove that this legislative distinction imposes an onerous procedural requirement from which the elderly are exempt. *See Harman*, 380 U.S. at 541–42; *see also Abbott*, 978 F.3d at 198 (Stewart, J., concurring in part and dissenting in part) (describing Texas voting laws similar to Indiana's as imposing "a material requirement to vote in person … on younger voters"). The practical difficulties of casting a ballot in person in Indiana, including the challenges of locating and physically going to a polling place during regular hours and any costs related to doing so (such as lost wages or child care costs), to the extent they are imposed on appellants because of their age, may rise to such a level as to render that method of voting unconstitutionally "cumbersome," *Harman*, 380 U.S. at 541, when compared to the absentee-voting procedure to which the elderly are entitled. I would give appellants an opportunity to make this showing before the district court, guided by our opinion here.

For these reasons, I respectfully concur in part and dissent in part.