In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 21-2449

PROTECT OUR PARKS, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

PETE BUTTIGIEG, Secretary of Transportation, *et al.*,

*Defendants-Appellees*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 21-cv-2006 — **John Robert Blakey**, *Judge*.

———————————

AUGUST 19, 2021

———————————

Before KANNE, WOOD, and HAMILTON, *Circuit Judges*.

PER CURIAM. In 2016, the City of Chicago and the Barack
Obama Foundation selected Jackson Park in Chicago as the
location for the Obama Presidential Center. The Center, con-
sisting of a museum, public library, and other spaces for cul-
tural enrichment and education related to the life and presi-
dency of Barack Obama, will take up about 20 acres of the
park and require that the City close several nearby roadways.
The National Park Service approved the City's plan to build

in the park on the condition that the City expand nearby spaces for public recreation. The Federal Highway Administration approved construction of new roadways to make up for the roadways the City was to close. Both agencies together performed an environmental assessment and concluded that their decisions would have an insignificant effect on the environment and were the least damaging alternatives available to each agency. But they did not consider whether the City could have further reduced environmental harms by building the Center elsewhere.

A group of concerned local citizens, headed by the organization Protect Our Parks, Inc., argued that this environmental review was too cramped; they sought to enjoin construction of the Center under the Administrative Procedure Act (APA), 5 U.S.C. § 702. The district court denied Protect Our Parks's request for a preliminary injunction on August 5. Protect Our Parks promptly moved to enjoin construction pending its appeal from that order. We denied that motion on August 13 and now explain our decision.

**I**

This is the second time Protect Our Parks has appeared before this court challenging the construction of the Center. It previously asserted that the City's choice to build the Center in Jackson Park violated state law and the United States Constitution. We affirmed summary judgment for the defendants on the constitutional claims but vacated judgment on the state-law claims for lack of jurisdiction, because Protect Our Parks's claims amounted to little more than a policy disagreement with the City's decision to locate the Center in Jackson Park. *Protect Our Parks, Inc. v. Chi. Park Dist.*, 971 F.3d 722, 728 (7th Cir. 2020), *cert. denied sub nom. Protect Our Parks, Inc. v.*

*City of Chicago*, No. 20-1259, 2021 WL 1602736 (U.S. Apr. 26, 2021).

While that litigation was ongoing, federal agencies reviewed the City's plans. Several agencies had a hand in the process, but the motion now before us centers on two: the National Park Service and the Federal Highway Administration.

The Park Service became involved because Jackson Park benefited from federal grants under the Urban Park and Recreation Recovery Program. The grants committed the City to maintaining Jackson Park for public-recreation purposes. Constructing the Center will require a conversion of recreational park land to non-recreational buildings. The relevant statute provides that the Service "shall approve such conversion" if it is consistent with an applicable program and there are conditions "to ensure the provision of adequate recreation properties and opportunities of reasonably equivalent location and usefulness" in the park. 54 U.S.C. § 200507. The City proposed constructing new recreation areas nearby for a net gain of public-recreation property, and the construction was consistent with all existing park plans, and so the Service gave its approval. The agency saw no other practical alternative that would fulfill the City and Foundation's objectives, which included building the Center in the community where President Obama had lived and worked.

The City's construction plans also required closing a few local roadways near the location where the Center is to be built. The City was free to close these local roads without federal approval, but when it proposed widening other streets to make up for the closures and sought federal funds to do so, the Highway Administration stepped in. Under section 4(f) of the Department of Transportation Act of 1966, the use of

parkland for a federal transportation program or project re-
quired the Administration to find that "(1) there is no prudent
and feasible alternative to using that land; and (2) the pro-
gram or project includes all possible planning to minimize
harm to the park …." 49 U.S.C. § 303(c). The Administration
reviewed several possible plans for how to build new road-
ways and approved "Alternative 9B" as the only feasible and
least harmful option. Each alternative it considered, including
the one it labeled "no-action," assumed that the Center would
be built and the existing roadways closed; the differences
were confined to the questions whether and how new roads
would be constructed to compensate.

The two agencies together prepared an environmental as-
sessment and concluded that their decisions would not cause
a "significant" impact requiring an environmental impact
statement under the National Environmental Policy Act
(NEPA), 42 U.S.C. § 4332(C). See 40 C.F.R. § 1508.9 (2019) (de-
scribing environmental assessment). In conducting that as-
sessment, the agencies noted that they did not "have approval
authority over the placement of the [Center] in Jackson Park
(or of its design); nor do they have approval authority over
the road closures in Jackson Park." They limited their review
to the environmental impact of "alternatives within the scope
of their authority" and split the possibilities into three alter-
natives: (A) neither the Park Service nor the Highway Admin-
istration approves the City's proposal, (B) only the Park Ser-
vice approves, and (C) both approve.

Protect Our Parks's claims in this lawsuit center on the
agencies' chosen alternatives. It contends that the agencies ar-
bitrarily limited themselves to the parts of the City's plans
over which they had approval authority, rather than more

globally considering alternatives, including the possibility of a different location for the Center. If they had considered building the Center elsewhere, Protect Our Parks insists, then the agencies would have found that there were less environmentally damaging locations. Protect Our Parks further contends that the agencies' environmental assessment failed to appreciate fully the impact of Alternative C.

The district court denied a preliminary injunction. It concluded that the agencies had no obligation to consider alternative locations and that Protect Our Parks's disputes with the assessment were "nothing more than disagreements about substantive decisions" that were unlikely to succeed. See *Protect Our Parks, Inc. v. Buttigieg*, No. 21-cv-2006, 2021 WL 3566600 at *9 (N.D. Ill. Aug. 12, 2021).

Protect Our Parks appealed the denial of the preliminary injunction, 28 U.S.C. § 1292(a)(1), and moved for an injunction pending the outcome of its appeal, FED. R. APP. P. 8. We denied the motion after considering the arguments in support of it, the defendants' responses, and submissions from *amici curiae*.

## II

An injunction pending appeal is an extraordinary remedy, just like any other injunction. See *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 544, 547 (7th Cir. 2007). To be entitled to this interim relief, the party seeking the injunction (here, the plaintiff) "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Although a plaintiff

need not show by a preponderance of the evidence that she will win her suit, the mere possibility of success is not enough; she must make a "strong" showing on the merits. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020), *cert. denied,* 141 S. Ct. 1754 (2021). Protect Our Parks's claims do not meet this standard.

Protect Our Parks's central theory is that the agencies unlawfully "segmented" their review under the NEPA. That statute requires federal agencies to prepare an environmental impact statement for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). "'Piecemealing' or 'segmentation,' … 'allows an agency to avoid the NEPA requirement that an [impact statement] be prepared for all major federal action with significant environmental impacts by segmenting an overall plan into smaller parts involving action with less significant environmental effects.'" *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 962 (7th Cir. 2003) (quoting *City of West Chicago v. NRC*, 701 F.2d 632, 650 (7th Cir. 1983)). Protect Our Parks insists that the agencies found no significant environmental impact only by separating the federal decisions—whether to approve the conversion of recreation property and whether to expand the roadways—from the state decision to build the Center in Jackson Park. If the agencies had considered alternative locations, Protect Our Parks argues, then they would have found building elsewhere to be the least environmentally harmful option.

The first problem with Protect Our Parks's position is that it fails to take into account the deference courts owe to agencies with respect to relevant scope of a project. See *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976) (finding the decision of the Department of the Interior not to prepare an EIS regarding

coal production on the entire Northern Great Plains region not to be arbitrary). In addition, as the district court recognized, segmentation refers only to the situation that arises when an agency arbitrarily separates related *federal* actions from one another. The Center is a local project, and the federal government has no authority to fix its location. Without federal involvement we do not even reach the issue whether the federal government segmented its actions. See *Old Town Neighborhood Ass'n Inc. v. Kauffman*, 333 F.3d 732, 735 (7th Cir. 2003). That is because the NEPA requires an impact statement only for "major Federal actions," which the relevant regulations define to mean actions that are "potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18 (2019). Environmental harm that federal agencies do not cause is irrelevant. See *Mineta*, 349 F.3d at 954 & n.3.

Moreover, the agency's actions must be both a factual and a proximate cause of the asserted harm. See *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004). The Park Service's approval was a factual cause of the Center's placement in Jackson Park, because construction could not start without its approval, but the agency's limited authority prevented it from being a proximate cause of any damage resulting from the Center. The Park Service "shall" approve conversion that meets the criteria of 54 U.S.C. § 200507; it need not assess "the environmental impact of an action it could not refuse to perform." *Pub. Citizen*, 541 U.S. at 769; see also *Sauk Prairie Conservation All. v. U.S. Dep't of the Interior*, 944 F.3d 664, 680 (7th Cir. 2019) ("Because the National Park Service had no authority to end the helicopter training, there is no causal connection between its decision to approve the provision [that permitted training] and any environmental effects continued training might have."), *cert. denied*, 140 S. Ct. 2764 (2020). Put another

way, the agencies must take the objectives they are given and consider alternative means of achieving those objectives, not alternative objectives. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991) (Thomas, J.). The City's objective was to build the Center in Jackson Park, so from the Park Service's perspective, building elsewhere was not an alternative, feasible or otherwise.

The causal link between the Center and the Highway Administration's actions is even more tenuous. Constructing the Center is not an effect of the Administration's approval, but the predicate condition for it. The City has the authority to close the roadways to build the Center without federal approval. See *Old Town Neighborhood Ass'n*, 333 F.3d at 735–36. If the Center were not built and the roadways were not closed, then the Highway Administration would have no new road construction to approve or disapprove.

In any event, the agencies did consider the full environmental impact of the Center's construction (as an "indirect" effect of the Park Service's decision to approve conversion) and concluded that it was not "significant." We review that determination under the APA's familiar "arbitrary and capricious" standard, 5 U.S.C. § 706(2)(A), and ask only if the agency's decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). "If an agency considers the proper factors and makes a factual determination on whether the environmental impacts are significant or not, that decision implicates substantial agency expertise and is entitled to

deference." *Mineta*, 349 F.3d at 953 (quoting *Ind. Forest Alliance, Inc. v. U.S. Forest Serv.*, 325 F.3d 851, 859 (7th Cir. 2003)).

Protect Our Parks has not shown it is likely to overcome this deference. Its arguments are, as the district court recognized, disputes with the agencies' substantive judgment, which we typically do not second-guess, so long as the agency has followed the required procedures. See *Env't L. & Pol'y Ctr. v. NRC*, 470 F.3d 676, 685 (7th Cir. 2006).

Protect Our Parks contends that the agencies ignored the environmental impact of cutting down around 800 trees to build the Center. But the agencies reviewed a meticulous tree survey and determined that the City's plan to provide 1:1 replacement with new trees would result in long-term environmental benefits, or at least end up neutral. Protect Our Parks argues that current trees and future saplings are not equivalent, but it is not our role to decide the relative value of the long- and short-term. Protect Our Parks also argues that the City's decision to restrict tree removal during migratory birds' breeding season is an admission that removing the trees will significantly harm the birds. The City's efforts to mitigate harm, though, do not imply that the harm, *once mitigated*, remains significant; they do not even necessarily imply it was significant to begin with. The agencies reasonably determined that the unaffected 500-plus acres of Jackson Park will provide the birds a comfortable environment during construction. Finally, the agencies took the necessary "hard look" at Jackson Park's historical features. See *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 673 F.3d 518, 526 (7th Cir. 2012). The agencies recognized that Jackson Park will change with the addition of the Center, but they also recognized that it has changed before. The City's plans include conscious efforts to integrate

the Center with the existing landscape and to fulfill the vision of the Park's designer, Frederick Law Olmsted. Protect Our Parks is unlikely to show that the agencies made a clear error in judgment when weighing the benefits of change against history.

## III

For the foregoing reasons, we denied the motion for an injunction pending appeal. Protect Our Parks also asks us to expedite this appeal. That request is granted, and an expedited briefing schedule will issue separately.