In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 22-3190

PROTECT OUR PARKS, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

PETE BUTTIGIEG, Secretary of Transportation, *et al.*,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:21-cv-02006 — **John Robert Blakey**, *Judge*.

_____

ARGUED OCTOBER 24, 2023 — DECIDED APRIL 8, 2024

_____

Before ROVNER, WOOD, and HAMILTON, *Circuit Judges*.

WOOD, *Circuit Judge*. This appeal represents, we hope, the final installment in the long-running challenge led by a group called Protect Our Parks, Inc. ("POP"), which strenuously objects to the location of the planned Obama Presidential Center in Chicago. See *Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722 (7th Cir. 2020) ("POP I"), *cert. denied sub nom. Protect Our Parks, Inc. v. City of Chicago*, 141 S. Ct. 2583 (2021); *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758 (7th Cir. 2021) (*per*

*curiam*) ("*POP II*"); *Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389 (7th Cir. 2022) ("*POP III*"). Throughout the present phase of the case, the Center has been under construction. But the rub is this: it is rising in a corner of Chicago's historic Jackson Park on a site selected by the Barack Obama Foundation. POP contends that Jackson Park should have been off-limits, and it insists that the Center easily could have been placed elsewhere. Raising a bevy of arguments—seven based on federal law, eight on state law—all seeking to prevent the construction of the Center in Jackson Park, POP and its co-plaintiffs sued numerous state and federal defendants. (We refer to the plaintiffs collectively as POP unless the context requires otherwise.) Construction is now well underway, and the Center is expected to be completed in late 2025.

Earlier adverse rulings from this court, plus the on-the-ground reality of the construction, have not deterred POP. Most recently, it asked us to enjoin construction until the courts resolve its federal-law theories. But it failed to make the requisite showing that it was likely to succeed with those contentions, and so we declined to grant the preliminary injunction it sought. See *POP III*, 39 F.4th at 397. In the meantime, the district court refused POP's request to amend its pleadings and dismissed the state-law causes of action. At the request of the parties, the district court then awarded summary judgment against POP on the federal-law theories.

POP has now asked us to overturn the district court's final judgment in its entirety. In support of its federal-law theories, it presents the identical factual record that we reviewed in *POP III*, supported by the same arguments. Those arguments remain unpersuasive. Moreover, we have identified no legal error in our earlier analysis of POP's case, and so we stand by

that decision. We also conclude that POP's state-law theories were rightly dismissed and that the district court did not abuse its discretion when it denied POP's motion to amend the complaint. In summary, we affirm the judgment of the district court.

## I.  Background

Although this ground has been well trodden, we review the underlying facts and the course of the litigation for the convenience of those who do not wish to track down and reread our earlier decisions.

### A.  The Proposed Locations for the Center

In March 2014, the Barack Obama Foundation ("the Foundation"), a private not-for-profit organization, initiated a nationwide search for a future home for the Obama Presidential Center ("the Center"), a presidential library that would honor the work and legacy of the 44th president. Various organizations around the country and in Chicago recommended potential sites for the Center.

The University of Chicago proposed two locations near its campus: one in Washington Park and another in Jackson Park. Both are historic public parks in Chicago's South Side; the latter is a 551-acre park that sits in the Hyde Park and Woodlawn neighborhoods where President Obama once lived, worked, and began his public career. The Foundation eventually ranked these potential sites as two of its top three choices for the future location of the Center and communicated its assessment to the City of Chicago ("City").

In 2015, the Chicago City Council passed an ordinance ("the 2015 Ordinance") in which it expressed its "robust commitment to bringing the Presidential Center to Chicago." The

City Council determined that the Center would "expand the City's cultural resources, promote economic development, strengthen surrounding communities, … and serve other important public purposes." The 2015 Ordinance described several possible locations for the Center, including the Jackson Park site that the University of Chicago had proposed. That site is a 19.3-acre portion of parkland that lies on the western edge of Jackson Park, bounded on the north by Midway Plaisance Drive North, on the east by South Cornell Drive, on the south by East Hayes Drive, and on the west by Stony Island Avenue.

The 2015 Ordinance did not authorize any kind of development. It stated only that "the City will introduce a separate ordinance authorizing the development, construction and operation of the" Center on whatever site was chosen. But to achieve the "public purpose of facilitating the location, development, construction and operation of" the Center, the 2015 Ordinance authorized the City to accept a transfer of the proposed portion of Jackson Park from the Chicago Park District ("the Park District") if the Foundation settled on that site.

The Park District had held Jackson Park in the public trust since 1934, when a law passed by the Illinois General Assembly took effect. That law consolidated all existing parkland that lay entirely or partly within the territorial boundaries of Chicago and created the Park District to manage it. See 70 ILCS 1505/1. (The Park District later lost authority over parkland outside Chicago's corporate limits, but that change has no effect on our case. See *id.* 1505/1a.) Before the 1934 legislation, the parkland was held by the South Park Commission, which had been created in 1869 with the authority to select certain lands that would "be held, managed and controlled by

them and their successors as a public park, for the recreation, health, and benefit of the public, and free to all persons forever[.]" 1 LAWS OF THE STATE OF ILLINOIS 1869, at 360. In addition to enjoying the status of public-trust land since it was acquired by the South Park Commissioners, Jackson Park has been on the National Register of Historic Places since 1972 for, among other things, serving as part of the grounds for the 1893 Columbian Exposition.

Shortly after the City passed the 2015 Ordinance, the General Assembly amended the Park District Aquarium and Museum Act. See 70 ILCS 1290/1 ("Museum Act"). The amendment, which became effective on January 1, 2016, allows cities and park districts to build museums, including presidential centers, in their public parks. *Id.* It also authorizes cities and park districts to contract out the construction, maintenance, and operation of those museums to private entities organized for that purpose. *Id.* Finally, the amended Museum Act "reaffirmed" the General Assembly's view that museums "serve valuable public purposes[.]" *Id.*

### B. The Selection of Jackson Park as the Site

After evaluating its options, the Foundation selected Jackson Park as its preferred site for the Center. It then submitted a specific proposal to the Chicago Plan Commission to build the Center at that location. Along with the proposal, the Foundation applied for the various permits and approvals needed to undertake the development. According to the plans, the Center will include four buildings and an underground parking facility, all situated on a campus at the northwestern edge of the park. It will feature a museum, a branch of the Chicago public library, spaces for cultural and educational events, athletic spaces, green space, and an archive commemorating the

lives and legacies of President Barack Obama and First Lady Michelle Obama. In its proposal, the Foundation offered to cover all costs associated with the Center's construction.

The Plan Commission reviewed the Foundation's submissions, held public hearings on the proposal, and in May 2018 unanimously recommended approval of the application. The City Council approved the Plan Commission's recommendation and granted the necessary permits. A few months later, the City Council passed an ordinance ("the 2018 Ordinance") that allowed the City to accept title to the Jackson Park site from the Park District. The 2018 Ordinance also authorized the City to enter into agreements governing the Foundation's use of the site. A second ordinance authorized the City to vacate portions of Midway Plaisance Drive South and Cornell Drive to make way for the Center.

Pursuant to the 2018 Ordinance, the City entered into an agreement with the Foundation ("Use Agreement") that set the terms of the Foundation's use of the Jackson Park site. It provides that the Foundation may use the Jackson Park site for 99 years, but that the City will retain title to the land and acquire title to the buildings and site improvements built on it. The Use Agreement also requires the Foundation to fund the construction of the Center and to operate it consistently with the requirements of the Museum Act. Finally, an option allows the City to terminate the Use Agreement if the Foundation fails to use the Center for its authorized purpose.

In May 2019, the City and the Foundation finalized a second agreement ("Master Agreement"). Section 12 of the Master Agreement sets forth various conditions precedent to the City's obligation to execute the Use Agreement. Relevant here are sections 12(h), which requires the Foundation to certify to

the City in writing that it has received funds equal to the projected total cost of constructing the Center, and 12(j), which requires the Foundation to establish an endowment for the purpose of operating and maintaining the Center during the term of the Use Agreement. A provision in the Master Agreement gives the City the option to waive these or any other conditions precedent. Found in the final paragraph of section 12, it states, in pertinent part, that "[i]f any one of the above conditions [including 12(h) and 12(j)] is not satisfied by the Closing Date, the City may, at its option, waive such condition[.]"

## C. The Federal Review Process

The federal government took no part in the process of selecting the Jackson Park site as the location for the Center, nor did it participate in the design of the campus. The City did not need federal approval to close portions of existing roads in Jackson Park. But the project was not entirely clear of federal legal obligations. The choice of Jackson Park triggered five mandatory federal reviews: (1) one by the Federal Highway Administration ("Highway Administration") pursuant to section 4(f) of the Department of Transportation Act of 1966 ("Transportation Act"), see 49 U.S.C. § 303; (2) a joint environmental assessment by the National Park Service ("the Park Service") and the U.S. Department of Transportation pursuant to the National Environmental Policy Act ("NEPA"), see 40 C.F.R. § 1501.4 (2019); (3) a review by the Park Service under the Urban Park and Recreation Recovery Act ("UPARR Act"), see 54 U.S.C. §§ 200501–200511; (4) a review by the Highway Administration pursuant to section 106 of the National Historic Preservation Act ("NHPA"), see 54 U.S.C. § 306108; and (5) a review by the United States Army Corps

of Engineers of the City's requests for a section 408 permit, see 33 U.S.C. § 408, and a permit to fill less than an acre of navigable waters temporarily, see 33 U.S.C. § 1344(a).

We thoroughly examined each of those agency reviews in *POP III*. See 39 F.4th at 393–96. None of the parties has pointed to any flaw in the recitation of the facts we drew from the administrative record and set forth in that decision. Indeed, the parties jointly stipulated that there are no pertinent facts other than those in the administrative record and there are no disputes of material fact relevant to the legal theories before us. Thus, rather than restate undisputed facts, we simply assume familiarity with this portion of *POP III*.

### D.  Procedural History

#### 1.  *POP I*

In 2018, POP (along with a few others not involved with this case) launched a lawsuit arguing that the plan for the Center violated the Takings Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment. When that lawsuit came before this court, we affirmed the district court's grant of summary judgment for the defendants on the constitutional theories, but we vacated judgment on the state-law theories and dismissed them without prejudice because POP had not suffered an injury in fact and thus lacked Article III standing. See *POP I*, 971 F.3d at 728.

#### 2.  *POP II*

No sooner was the ink dry on *POP I* when POP joined forces with others who share its opposition to the Jackson Park site: Nichols Park Advisory Council, which is an Illinois not-for-profit organization that shares POP's mission of advocating for public parks, and five individuals who reside in

Chicago and who have long used and appreciated the aesthetic beauty of Jackson Park. POP and its new allies initiated the present action in April 2021 against the City and the Park District (collectively, "the City"), the Foundation, and a group of federal and state officers. The individual defendants, all of whom were sued only in their official capacities,[1] are Pete Buttigieg, the Secretary of Transportation; Shailen Bhatt, the Administrator of the Highway Administration; the Environmental Programs Engineer of the Illinois Division of the Highway Administration;[2] Deb Haaland, the Secretary of the Interior; Frank Lands, the Deputy Director of Operations of the National Park Service; Christine Wormuth, the Secretary of the Army; and Kenneth Rockwell, the Commander of the Chicago District of the Army Corps of Engineers.

POP relied on the Administrative Procedure Act, 5 U.S.C. § 702, for seven of the fifteen counts in its new complaint. Those counts raised the following theories: (1) the City, the Foundation, and the Highway Administration defendants violated section 4(f) of the Transportation Act (Count I); (2) all federal defendants violated NEPA (Count II); (3) the City, the Foundation, the Park Service, and the Department of Interior violated the UPARR Act (Count III); (4) all defendants

---

[1] Some of the officials named in POP's complaint have since been replaced by new officers. Pursuant to FED. R. APP. P. 43(c)(2), we have substituted the current officials.

[2] This office is currently vacant. We note that it is unclear whether entities such as the Environmental Programs section of the Highway Administration are suable entities. The answer here does not matter, however. This is not a jurisdictional question, and the presence of the City, the Secretary, and the Administrator assures us that there are ample proper defendants.

violated section 106 of the NHPA (Count IV); (5) the City and the Army Corps violated section 408 of the Rivers and Harbors Act, 33 U.S.C. § 408, and section 404 of the Clean Water Act, *id.* § 1344 (Count V); (6) all defendants violated Article I, Section 1 of the United States Constitution (Count X); and (7) all defendants violated section 110(k) of the NHPA, 54 U.S.C. § 306113 (Count XIV).

The other eight counts allege violations of various state laws: the public-trust doctrine (Count VI); the prohibition on *ultra vires* actions (Count VII); Article VIII, Section 1 of the Illinois Constitution (Count VIII); the Takings Clause of the Illinois Constitution (Count IX); Article II, Section 1 of the Illinois Constitution, which prohibits improper delegations of authority (Count XI); Article I, Section 2 of the Illinois Constitution (Count XII); Article I, Section 16 of the Illinois Constitution (Count XIII); and the Illinois State Agency Historic Preservation Resources Act, 20 ILCS 3420/1 (Count XV). Those counts fall within the district court's supplemental jurisdiction. See 28 U.S.C. § 1367.

Soon after filing its complaint, and just days before the Foundation was scheduled to break ground on the Center, POP moved for a preliminary injunction based on the federal-law theories. It insisted that construction of the Center in Jackson Park had to be enjoined because the federal review process fell short—woefully so, in its view—of the statutory requirements. The district court concluded that POP was unlikely to prevail on the merits of its contentions and promptly denied its motion. POP then turned to us, seeking a preliminary injunction pending appeal, but, finding that POP had not shown the necessary likelihood of success on the merits, we denied this interim relief. See *POP II*, 10 F.4th at 763.

### 3. *POP III*

POP then moved ahead with its appeal of the district court's order denying its motion for a preliminary injunction. See 28 U.S.C. § 1292(a)(1). After full briefing and oral arguments, we held that POP failed to make "at least … a 'strong' showing of likelihood of success … under any of the theories it … invoked." *POP III*, 39 F.4th at 397. POP's principal theory was that the federal agencies' decision not to prepare a full-blown environmental impact statement for purposes of NEPA (as opposed to a more abbreviated environmental assessment, which was done) was arbitrary and capricious. It was unlikely to succeed on this theory, we said, because "the record shows that the Park Service and Department of Transportation took the necessary hard look at the likely environmental consequences of the project before reaching their decisions." *Id.* at 398. The agencies had "thoroughly studied the project through the lens of the required regulatory factors before reaching their decision that no environmental impact statement was required," and so, we concluded, their decision "implicates substantial agency expertise and is entitled to deference." *Id.* at 399 (quotation omitted).

POP's second theory was that the Park Service and the Department of Transportation were under an obligation imposed by NEPA to evaluate alternative locations for the Center throughout Chicago. The agencies had avoided this alleged requirement, POP contended, by treating the City's selection of Jackson Park as a given. It saw the Department's decision not to question the selection of the Jackson Park site as an unlawful "segmentation" of the project to make the environmental impact appear smaller.

We concluded that this argument was "fatally flawed for three reasons." *Id.* "First, NEPA reaches only major federal actions, not actions of non-federal actors," and because "[t]he Center was not a federal project, … no federal agency had the authority to dictate to the [Foundation or the City] where the Center would be located." *Id.* Second, POP failed to establish causation. We explained that "NEPA requires agencies to consider only environmental harms that are both factually and proximately caused by a relevant federal action." *Id.* Notably, "the federal government has no authority to choose another site for the Center or to force the City to move the Center, and so no federal action was a proximate cause of any environmental harms resulting from the choice of Jackson Park." *Id.* at 400. Finally, we said that POP "ignore[d] the 'reasonable' half of the reasonable-alternatives requirement" because "[i]t would be unreasonable to require agencies to spend time and taxpayer dollars exploring alternatives that would be impossible for the agency to implement." *Id.*

The same problems undermined many of POP's other theories. For example, it argued that the Highway Administration should have evaluated alternative locations for the Center when conducting its section 4(f) review. But the Highway Administration's decision to take the location of the Center as a given was not arbitrary and capricious because the agency "could not have compelled the City to locate the Center at a different site." *Id.* at 401. POP's other arguments suffered from the same flaw. Thus, after thoroughly reviewing the administrative record and addressing each of POP's arguments, we concluded that the district court had properly denied its request for a preliminary injunction.

4.   Events Following *POP II*

A few things happened between the time POP filed its interlocutory appeal and the date of our decision in *POP III*. In August 2021, the Foundation broke ground on the project. The construction in Jackson Park continues to this day. Press reports indicate that the Foundation expects the Center to be completed by late 2025. See, *e.g.*, Lynn Sweet, *Halfway Built, the Obama Presidential Center Is Already a South Side Landmark*, CHICAGO SUN TIMES (Oct. 13, 2023).

Back in the district court, there were two important developments. First, the City and the Foundation filed a motion to dismiss the state-law counts for failure to state a claim. See FED. R. CIV. P. 12(b)(6). Second, after the motion to dismiss was briefed and argued but before the court ruled on it, POP sought leave to amend the complaint pursuant to Federal Rule of Civil Procedure 15(a). It wanted to add breach-of-contract and unjust-enrichment theories against the City and the Foundation, on the ground that two conditions precedent of the Master Agreement had not been satisfied. The district court concluded that the two theories would be futile because POP had no enforceable rights under the Master Agreement; it accordingly denied leave. About three months later, the court granted the motion to dismiss the state-law counts.

Following this dismissal and our mandate in *POP III*, the parties submitted a joint stipulation to the district court. As we noted earlier, they agreed that all pertinent facts could be found in the administrative record and that no additional briefing was necessary beyond what was submitted at the preliminary-injunction stage. They also requested a final judgment on the federal-law counts in favor of the defendants in order to pave the way for appellate review. The district court

adopted the parties' proposed order and entered final judgment for the defendants.

POP now appeals the judgments dismissing its state-law theories and awarding summary judgment to the defendants on the federal-law counts, as well as the district court's order denying leave to amend. We address these rulings in reverse sequence.

## II.     The Motion to Amend

POP filed its motion to amend in November 2021, seven months after its initial complaint. The amendment would have added two additional state-law theories against the City and the Foundation. The first asserts that the City violated the Master Agreement because the conditions precedent to the transfer of parkland to the Foundation set out in sections 12(h) and 12(j) were not satisfied; the second attempts to raise an unjust-enrichment claim predicated on that failure. The district court denied the request, concluding that amendment would be futile because the Master Agreement does not confer legally enforceable rights on any of the plaintiffs. We review that decision for abuse of discretion. See *Johnson v. Cypress Hill*, 641 F.3d 867, 871 (7th Cir. 2011).

Once the time for amendments as a matter of course has expired, a party may amend its complaint only with leave from the district court or written consent of the adverse parties. See FED. R. CIV. P. 15(a)(2). Although a district "court should freely give leave when justice so requires," *id.*, "leave to amend is not to be automatically granted," *Johnson v. Methodist Medical Center of Illinois*, 10 F.3d 1300, 1303 (7th Cir. 1993), and "[a] district court does not abuse its discretion in denying a motion to amend when amending the pleading would be a

futile act," *Wilson v. Am. Trans Air, Inc.*, 874 F.2d 386, 392 (7th Cir. 1989). An amendment would be futile "if the amended pleading could not survive a motion for summary judgment." *Wilson*, 874 F.2d at 392.

POP's first new theory, as we said, focuses on sections 12(h) and 12(j) of the Master Agreement. Section 12(h) provides that the Foundation must certify in writing that it has sufficient funds to cover the cost of constructing the Center; 12(j) requires the Foundation to establish an endowment to operate, enhance, and maintain the Center for the duration of the lease term set forth in the Use Agreement. According to POP, neither of these conditions was satisfied by the time construction of the Center began. As we noted earlier, the Master Agreement authorizes the City to waive any conditions precedent to the contract, but no one suggests that the City pursued this option.

Even assuming, as we must, that the requirements of sections 12(h) and (j) have not been satisfied, POP's breach-of-contract theory is still futile. It is a "rather vanilla statement of contract law" that "a cause of action based on a contract may be brought only by a party to that contract, by someone in privity with such a party, or by an intended third-party beneficiary of the contract." *Northbound Group, Inc. v. Norvax, Inc.*, 795 F.3d 647, 651 (7th Cir. 2015) (quotation omitted). The Master Agreement is a contract between only the City and the Foundation: the plaintiffs play no part in it.

Neither can POP point to any rights as a third-party beneficiary of the Master Agreement. "Illinois law holds a strong presumption against creating contractual rights in third parties, and this presumption can only be overcome by a showing that the language and circumstances of the contract manifest

an affirmative intent by the parties to benefit the third party." *Estate of Willis v. Kiferbaum Const. Corp.*, 830 N.E.2d 636, 642–43 (Ill. App. Ct. 2005) (citing *Bates & Rogers Const. Corp. v. Greeley & Hansen*, 486 N.E. 2d 902 (Ill. 1985)). Section 34 of the Master Agreement states that the contract confers no benefits upon non-parties, thereby expressly disavowing any intention to confer contractual rights on POP and its co-plaintiffs.

POP does not argue that general principles of contract law provide the necessary enforceable rights. Rather, it argues that it can enforce the terms of the Master Agreement because the plaintiffs are municipal taxpayers and residents. POP contends that *Malec v. City of Belleville*, 891 N.E.2d 1039 (Ill. App. Ct. 2008), supports this theory. We read that case differently. *Malec* is one of several cases holding that, under Illinois law, "'a taxpayer has standing to bring suit, even in the absence of a statute, to enforce the equitable interest in public property which he claims is being illegally disposed of.'" *Id.* at 1042 (quoting *Martini v. Netsch*, 650 N.E.2d 668, 670 (Ill. App. Ct. 1995)). Those cases might allow a taxpayer to challenge a land use that violates state or municipal law, see *id.* at 1042–43, but they do not establish that an alleged violation of a municipal contract is grounds for a taxpayer suit. *Malec* does not recognize a cause of action that would allow a plaintiff to challenge a land use made in violation of a contract to which it is not a party. POP has not directed us to any authority that supports its position, and so it would be futile for it to add the proposed breach-of-contract claim.

Perhaps recognizing that its first theory falls short, POP suggests an alternative theory that we charitably will call unusual. It tells us that its self-styled breach-of-contract claim is actually a "taxpayer derivative action," and that it is merely

trying to enforce contractual rights belonging to the City. While we appreciate POP's creativity in this respect, we are unable to connect this new line of argument with the claim POP described in the proposed amended complaint. Illinois courts do allow a taxpayer to bring suit "on behalf of a local governmental unit to enforce a cause of action belonging to the local governmental unit." *Scachitti v. UBS Fin. Servs.*, 831 N.E.2d 544, 550 (Ill. 2005). But recovery must run in favor of the local government. See *Feen v. Ray*, 487 N.E.2d 619, 621 (Ill. 1985). Here, POP seeks relief *against* the City (which is a defendant-appellee in this case, and which is having no trouble speaking for itself). The lack of a relation between the relief requested in the amended pleading, on the one hand, and the nature of a taxpayer derivative suit, on the other, shows that this theory would not so much recharacterize the claim as it would transmogrify it. Because POP's proposed complaint is inconsistent with this new theory, it does not belong in the case. See *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996).

POP's second proposed new theory is also doomed. Under Illinois law, unjust enrichment "is a condition that may be brought about by unlawful or improper conduct as defined by law." *Alliance Acceptance Co. v. Yale Ins. Agency, Inc.*, 648 N.E.2d 971, 977 (Ill. App. Ct. 1995) (quotation omitted). A party may not dress up an unsuccessful contract claim in the garb of unjust enrichment, but that is what POP is doing here. Its unjust-enrichment claim cannot stand on its own: "the request for relief based on unjust enrichment is tied to the fate of the [breach-of-contract] claim." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 740 (7th Cir. 2019). The district court acted well within its discretion when it denied leave to amend.

### III.    The Federal-Law Theories

We now turn to familiar ground: POP's federal-law arguments. The district court awarded summary judgment to the defendants on all seven of those counts. On appeal, POP has presented adequate arguments challenging the rulings on only three of them. (We briefly address its four other points in Part V of this opinion.) We evaluate the district court's ruling *de novo*, construing the record in the light most favorable to POP and drawing all reasonable inferences in its favor. See *Burton v. Downey*, 805 F.3d 776, 783 (7th Cir. 2015).

#### A.  Application of Law of the Case

As we noted at the outset, we covered much of this territory in *POP III*, where we concluded that POP had failed to establish a strong likelihood of success on the merits. See 39 F.4th at 397. With that decision in hand, the defendants urge us to conclude that *POP III* establishes the law of the case.

"The law of the case doctrine is a rule of practice, based on the sound policy that, when an issue is once litigated and decided, that should be the end of the matter." *Tully v. Okeson*, 78 F.4th 377, 380 (7th Cir. 2023) (cleaned up). It "establishes a presumption that a ruling made at one stage of a lawsuit will be adhered to throughout the suit." *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995). Nonetheless, the rule is neither "a straitjacket," *id.*, nor "hard and fast," *Tice v. Am. Airlines, Inc.*, 373 F.3d 851, 854 (7th Cir. 2004). The strength of the presumption "varies with the circumstances." *Avitia*, 49 F.3d at 1227.

POP argues that the law-of-the-case rule has no force here because *POP III* was a preliminary-injunction ruling. As it sees things, a court may apply the doctrine only if its prior

ruling was a final judgment on the merits. This argument misunderstands the doctrine.

It is true that in many circumstances it is inappropriate to allow a decision granting or denying a preliminary injunction to supply the law of the case in a later appeal. See, *e.g.*, *Hunter v. Atchison, T. & S. F. Ry. Co.*, 188 F.2d 294 (7th Cir. 1951); *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277 (7th Cir. 1998). We noted in *Thomas* two reasons why "[a] court must be cautious in adopting findings and conclusions from the preliminary injunction stage in ruling on a motion for summary judgment." 138 F.3d at 292 (quotation omitted). First, "findings of fact and conclusions of law made at the preliminary injunction stage are often based on incomplete evidence and a hurried consideration of the issues." *Id.* Second, "different standards apply in the two contexts (reasonable likelihood of success on an injunction, and the existence of any genuine issues of material fact on summary judgment)." *Id.* As we have noted elsewhere, "a less-than-developed record, a short timeline, and a concomitant truncated legal analysis … usually counsel against invoking the law of the case doctrine in a way that would preclude a full merits determination." *Tully*, 78 F.4th at 381.

But "rarely" does not mean "never." We, like our sister circuits, have recognized that "this general rule does not apply to 'a fully considered appellate ruling on an issue of law made on a preliminary injunction appeal.'" *Id.* (cleaned up and quoting 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4478.5 (3d ed. 2019)); see also *Howe v. City of Akron*, 801 F.3d 718, 740 (6th Cir. 2015) (collecting cases from other courts of appeals). In other words, where the concerns we have discussed are not

present, an earlier legal conclusion underlying a ruling on a motion for a preliminary injunction may establish the law of the case.

This case falls comfortably into that exception to the general rule. We had ample time in *POP III* to consider the identical record that is now before us, and so there are no new facts we must incorporate. The legal issues have also remained the same. These were litigation choices POP made. All it has done during this round is to present the same legal arguments that we rejected in *POP III* and to insist that our earlier conclusions of law were erroneous. Its arguments are no more persuasive now than they were then.

In the interest of completeness, however, we are willing to consider whether POP has offered any reason that would justify our setting aside those earlier legal conclusions. A party is "free to argue that an intervening change in law or other changed or special circumstance warrants a departure" from law of the case. *Tice*, 373 F.3d at 854. We have identified various circumstances in which the court ought not to follow the law of the case, such as when there is "a decision of the Supreme Court [or of this court sitting *en banc*, see *Kathrein v. City of Evanston*, 752 F.3d 680, 685–86 (7th Cir. 2014),] after the first review that is inconsistent with the decision on that review … [or] a conviction on the part of the second reviewing court that the decision of the first was clearly erroneous." *Chicago & N.W. Transp. Co. v. United States*, 574 F.2d 926, 930 (7th Cir. 1978).

We can find no decision of either this court or the Supreme Court that both post-dates and is inconsistent with our ruling in *POP III*. POP draws our attention to several decisions in which the Supreme Court has invoked the so-called "major

questions" doctrine. See *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724 (2022); *Becerra v. Empire Health Foundation*, 597 U.S. 424 (2022); *West Virginia v. EPA*, 597 U.S. 697 (2022). It argues that judicial deference to administrative agencies is now disfavored. That may be so (we have no need to express a view on the matter), but POP does not argue that this case presents a major question, nor has it drawn any other connection between this supposed general legal development and the issues raised in this case. It has not, for example, suggested that those cases changed the way courts review claims under the Administrative Procedure Act. And in any event, each of those decisions was issued before our decision in *POP III*, and so they do not present the kind of unusual circumstances that warrant displacing the presumption that law of the case applies.

In a last gasp, POP also contends that our decision in *POP III* was clearly erroneous. See *Agostini v. Felton*, 521 U.S. 203, 236 (1997) ("The doctrine does not apply if the court is convinced that its prior decision is clearly erroneous and would work a manifest injustice." (cleaned up)). Rehearsing the same arguments that we heard and rejected in our earlier ruling, it urges us to reverse course and accept them this time around. We decline the invitation. Far from finding "manifest error" in our earlier analysis, *Tully*, 78 F.4th at 381 (quotation omitted), our fresh look at the matter convinces us that *POP III* was correctly decided. Our earlier ruling therefore controls the federal-law theories on appeal. We could stop there, but for the sake of completeness, we summarize our key findings on POP's principal federal theories.

B.  NEPA (Count II)

As in *POP III*, POP argues that the defendants violated
NEPA in three distinct ways. It first says that the federal agen-
cies were required to prepare an environmental impact state-
ment, rather than an environmental assessment. Their deci-
sion that the assessment was enough was arbitrary and capri-
cious in POP's estimation, because the project requires the
City to remove approximately 800 trees that provide nesting
spaces for local and migratory birds, and it will affect an his-
torically and culturally significant area. This argument fails
for several reasons.

First, it misunderstands what NEPA is supposed to do.
"'The only role' for a court in applying the arbitrary and ca-
pricious standard in the NEPA context 'is to insure that the
agency has taken a "hard look" at environmental conse-
quences.'" *Highway J Citizens Group v. Mineta*, 349 F.3d 938, 953
(7th Cir. 2003) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410
n.21 (1976)) (alteration omitted). In other words, NEPA is a
process statute, not one that imposes enforceable environ-
mental standards. As we explained in *POP III*, the administra-
tive record shows that "the agencies were very thorough." 39
F.4th at 398. The environmental assessment includes, among
other things, a Natural Resources Technical Memorandum
that discusses the habits of migratory birds and how the pro-
ject will affect their nests, as well as a Tree Technical Memo-
randum that considers each species of tree that will be cut
down to build the Center.[3] After reviewing each of these ef-
fects, the agencies concluded that none would have a

---

[3] Given the broad scope of the relief measures POP seeks, the fact that
the trees are by now long gone does not render this appeal moot.

significant impact. The environmental assessment thus confirms that the agencies took the necessary hard look at the likely environmental impact before reaching a decision. Having found and explained that "the proposed action will not significantly affect the environment," the agencies were not also required to prepare the more elaborate environmental impact statement. *Indiana Forest Alliance, Inc. v. United States Forest Service*, 325 F.3d 851, 856 (7th Cir. 2003).

Second, POP argues that the agencies unlawfully segmented their NEPA review. Segmentation "'allows an agency to avoid the NEPA requirement that an [environmental impact statement] be prepared for all major federal action with significant environmental impacts by segmenting an overall plan into smaller parts involving actions with less significant environmental effects.'" *Mineta*, 349 F.3d at 962 (quoting *City of West Chicago v. United States Nuclear Regulatory Comm'n*, 701 F.3d 632, 650 (7th Cir. 1983)). In an effort to prove that the agencies unlawfully segmented the project when reviewing it, POP points solely to the fact that the Foundation's selection of the Jackson Park site requires the City to close some roadways and construct new ones using federal highway funds.

The City's plan to use federal funds to construct new roads near the site does not have the implications POP believes that it does. NEPA covers only "major Federal actions." 42 U.S.C. § 4332(2)(C); see also *Mineta*, 349 F.3d at 962. The project is a local, not a federal, initiative. The federal agencies had (and have) no control over where the Center is being built, and NEPA imposes no requirement that they oversee the Foundation's or the City's actions. For that reason too, this argument fails; we need not restate the many other problems with it. See *POP III*, 39 F.4th at 399.

POP's third contention is that NEPA required the federal agencies to consider alternative sites for the Center. This argument suffers from the same flaws as the last two. The federal agencies lacked the authority to dictate where the Center would be located, and so it would be unreasonable of them to waste time and resources exploring potential alternative sites. The federal agencies did all that NEPA required of them.

## C.  Transportation Act (Count I)

POP makes much the same reasonable-alternatives argument in support of its assertion that the City, the Foundation, and the Highway Administration defendants violated section 4(f) of the Transportation Act. Under that section, the Department of Transportation may approve a "transportation program or project" in a public park only if "(1) there is no prudent and feasible alternative to using the land; and (2) the program or project includes all possible planning to minimize harm to the park … or historic site[.]" 49 U.S.C. § 303(c). According to POP, section 4(f) required the defendants to consider reasonable alternatives to the Jackson Park site.

Its view is mistaken. The Highway Administration had no authority either to tell the Foundation to build the Center somewhere else or to forbid the City from authorizing that location. As we explained in *Old Town Neighborhood Association, Inc. v. Kauffman*, "[e]ntities that proceed on their own dime need not meet conditions for federal assistance or approval." 333 F.3d 732, 736 (7th Cir. 2003). POP points out that the project in *Old Town* did not involve the use of federal funds. But the federal agencies did not somehow acquire the authority to approve or deny the Jackson Park site through the City's request for road-building funds. The only difference that the request makes is that it required the Highway

Administration to conduct federally mandated reviews. The agency was entitled to take the Jackson Park site as a given when carrying out its duties.

### D. NHPA (Count IV)

POP's NHPA claim is the last of the federal-law theories. It argues yet again that a federal agency—here again, the Highway Administration—was required to consider alternative sites for the Center. The Highway Administration conducted a review pursuant to section 106 of NHPA, which is a procedural statute that requires agencies to "take into account the effect of the[ir] undertaking[s] on any historic property." 54 U.S.C. § 306108. Like NEPA, section 106 applies only to federal projects, not to local work such as the Foundation's plan to build the Center with the City's assistance. For that reason, and because the Highway Administration followed the procedural requirements of section 106, the defendants were entitled to summary judgment on this count.

### IV.    State-Law Theories

We arrive, finally, at POP's supplemental state-law theories. Upon a motion by the state defendants, the district court dismissed all eight of them pursuant to Federal Rule of Civil Procedure 12(b)(6). POP now appeals that decision, but we deem it necessary to discuss only two grounds. In so doing, we take a fresh look at the district court's decision to dismiss those two theories, accepting all well-pleaded factual allegations in the complaint as true and drawing all reasonable inferences in POP's favor. See *St. John v. Cach, LLC*, 822 F.3d 388, 389 (7th Cir. 2016). To survive a motion to dismiss, "the complaint must state a claim that is plausible on its face," *id.* (quotation omitted), which means that the "factual content [must

allow us] to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## A. The Public Trust (Count VI)

POP's primary state-law contention rests on the public-trust doctrine, which, it alleges, was violated by the actions of the City and the Foundation. It argues that Jackson Park is public-trust property under Illinois law, and, drawing an analogy to private trust law, that the City is akin to a trustee subject to fiduciary duties. The City breached its fiduciary duties, says POP, by transferring a portion of its parkland to the Foundation and giving the Foundation control over it.

Although we had no occasion to resolve POP's public-trust theory in *POP I*, we did explain the contours of the doctrine upon which it rests. In brief, "the public trust doctrine, established in American law by *Illinois Central Railroad Co. v. Illinois*, [146 U.S. 387 (1892),] prohibits a state from alienating its interest in public lands submerged beneath navigable waterways to a private party for private purposes." 971 F.3d at 729. As originally formulated in *Illinois Central*, the doctrine permitted a state to "alienate publicly owned submerged land to a private party [only] if the property will be 'used in promoting the interests of the public' or 'can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.'" *Id.* (quoting *Illinois Central*, 146 U.S. at 453).

The public-trust doctrine has evolved in Illinois so that it now applies to a broader swath of lands. Thus, as an Illinois appellate court has explained, although the doctrine applies to "mostly submerged land under Lake Michigan or the

Chicago River," it extends also to "parks" and "conservation areas." *Trinity Christian Schools v. Village of Western Springs*, 675 N.E. 168, 174 (Ill. App. Ct. 1996). What matters is that land has been acquired and dedicated for a public purpose "by the sovereign," at which point "the agencies created by [the sovereign] hold the properties in trust for the uses and purposes specified and for the benefit of the public." *Paepcke v. Public Bldg. Comm'n of Chicago*, 263 N.E.2d 11, 15 (Ill. 1970).

Illinois courts have developed a three-part test for determining whether a plaintiff may prevail on an alleged public-trust violation:

> [T]o state a cause of action under the public trust doctrine, facts must be alleged indicating that: certain property is held by a governmental body for a given public use; the governmental body has taken action that would cause or permit the property to be used for a purpose inconsistent with its originally intended public use; and such action is arbitrary or unreasonable.

*Paschen v. Village of Winnetka*, 392 N.E.2d 306, 309–10 (Ill. App. Ct. 1979); see also *Timothy Christian Schools*, 675 N.E.2d at 174. The parties agree that Jackson Park is public-trust land that has never been submerged, and that the Park District was created to administer it for the benefit of the public. See 1 THE LAWS OF THE STATE OF ILLINOIS 1869, at 360; 70 ILCS 1505/1. Their disagreement turns on whether the construction of the Center and the formation of agreements allowing the Foundation to maintain the Center violate the requirement that the parkland be put to a public use.

We observed in *POP I* that a "[d]edication to a public purpose isn't an 'irrevocable commitment,' and judicial review of any reallocation is deferential, particularly if the land in question has never been submerged." 971 F.3d at 730 (cleaned up and quoting *Paepcke*, 263 N.E.2d at 16). When a reallocation of trust land to a new public purpose is challenged, "'[t]he courts can serve only as an instrument of determining legislative intent as evidenced by existing legislation measured against constitutional limitations.'" *Friends of Parks v. Chicago Park Dist.*, 786 N.E.2d 161, 170 (Ill. 2003) (quoting *Paepcke*, 263 N.E.2d at 21). So long as constitutional limitations are not transgressed, our role is limited to ensuring that "there has been a sufficient manifestation of legislative intent to permit the diversion and reallocation contemplated by the plan." *Paepcke*, 263 N.E.2d at 18.

The Illinois General Assembly expressly permitted the construction and operation of presidential centers in parks held in the public trust with the passage of the Museum Act. See 70 ILCS 1290/1. That law authorizes cities and park districts "to purchase, erect, and maintain within any such public park or parks edifices to be used as … museums … , including presidential libraries, centers, and museums[.]" *Id.* The Museum Act also permits municipalities to contract with certain private entities to erect, maintain, and operate presidential centers. *Id.* In enacting this legislation, the General Assembly "reaffirmed and found that the … museums [] described in this Section, and their collections, exhibitions, programming, and associated initiatives, serve valuable public purposes[.]" *Id.* Among those purposes are "furthering human knowledge and understanding, educating and inspiring the public, and expanding recreational and cultural resources and opportunities." *Id.*

We have no doubt that the Center falls within this legislative grant of authority. As part of its efforts to honor the legacy of the nation's first Black president, the Center will feature records and artifacts from that president's administration and offer educational programming and initiatives to the public. It was also within the City's authority to contract with the Foundation, which was "organized for the construction [and] maintenance and operation of" the Center. *Id.* The Museum Act, coupled with the intended use of the Center and the City's existing arrangements with the Foundation, is enough to satisfy us that the portion of Jackson Park set aside for the Center will continue to serve a public purpose, as Illinois's public-trust doctrine requires.

POP does not dispute that the Center will bring these benefits to the public. Instead, it argues that we must apply some form of heightened scrutiny to the proposed land use, because, in its view, the Use Agreement and the Master Agreement were flawed transactions. In POP's telling, these transactions somehow undermine the Center's eligibility for public-trust treatment, because the doctrine incorporates well-established fiduciary duties from private trust law. But POP supports this theory with just two sources: a law review article that does not discuss the public-trust doctrine in Illinois and a decision from a New York state trial court. It has not directed us to any decision from an Illinois court recognizing this theory, nor have we found such a case. That is the end of it. POP brought this contention to federal court under the supplemental jurisdiction, 28 U.S.C. § 1367, and so we are bound to apply the existing law of Illinois, not whatever POP hopes Illinois law may someday be. See *id.* § 1652; see also *Felder v. Casey*, 487 U.S. 131, 151 (1988).

Changing tacks, POP argues that the General Assembly had no authority to modify the public purpose that originally supported the establishment of Jackson Park. It points to a passage in *Paepcke* that "refer[s] to the approach developed by the courts of … Wisconsin, in dealing with diversion [of public-trust land] problems." 263 N.E.2d at 19. The approach to which *Paepcke* refers involves the application of five factors, one of which is to consider whether "the public uses of the original area would be destroyed or greatly impaired" by the proposed reallocation. *Id.* But that language is plainly *dicta*: the court referred to the Wisconsin approach only "[i]n passing," and it stated that the approach was "not controlling" and only "a useful guide for future administrative action." *Id.* More recent cases confirm this understanding of *Paepcke*. In *Friends of Parks v. Chicago Park District*, for example, the Supreme Court of Illinois understood *Paepcke* as we have here, without mentioning the passage POP seizes on. See 786 N.E.2d at 170.

Finally, although POP has not alleged any specific profits that the Foundation will receive, we assume that the Foundation will benefit from maintaining and operating the Center. But under Illinois law, benefit to a private organization does not by itself violate the public-trust doctrine. See *id.* The doctrine would of course be violated if "the direct and dominating purpose here would be a private one" or if "the public purpose to be served [would] be only incidental and remote." *People ex rel. Scott v. Chicago Park Dist.*, 360 N.E.2d 773, 781 (Ill. 1976). But, as we have explained, the General Assembly determined that the main purpose of museums such as the Center is to benefit the public and there is nothing in the record that suggests otherwise. POP's allegations suggest at most that any "benefit to private interest [is] to further [the] public

purpose and [is] incidental to the public purpose." *Id.* (discussing *People ex rel. Moloney v. Kirk*, 45 N.E. 830 (Ill. 1896), which upheld a grant of submerged land to a private organization because the benefits to that organization were incidental to the public purpose). It is not our role to second-guess the re-purposing of a portion of Jackson Park for that new use, especially because the park was never submerged in navigable waters. Compare *Paepcke*, 263 N.E.2d 11 (never submerged land), with *Scott*, 360 N.E.2d 773 (submerged land). For all these reasons, POP has failed to state a plausible public-trust claim.

## B. Improper Delegation (Count XI)

POP also argues that the City unlawfully delegated its authority to fix the location of the Center to the Foundation in violation of Article II of the Illinois Constitution, which provides that "[t]he legislative, executive and judicial branches are separate. No branch shall exercise powers properly belonging to another." ILL. CONST., art. II, § 1. Its "smoking-gun" evidence appears in a recital in the 2015 Ordinance: "Whereas, while the City Council is confident in the quality and thoroughness of both UIC's and [the University of] Chicago's proposals, the City defers to the sound judgment of the President and his Foundation as to the ultimate location of the Presidential Library[.]" POP sees further proof of unlawful delegation in the City's decision to defer to the Foundation's preferred location for the Center.

Under Illinois law, "the legislature cannot delegate its legislative power to determine what the law should be." *East St. Louis Fed. of Teachers, Local 1220 v. East St. Louis Sch. Dist. No. 189*, 687 N.E.2d 1050, 1063 (Ill. App. Ct. 1998). Nevertheless, it "may delegate the authority to do those things it might

properly do, but cannot do as understandably or advantageously, if the authority that is granted is delineated by intelligible standards." *R.L. Polk & Co. v. Ryan*, 694 N.E.2d 1027, 1033 (Ill. App. Ct. 1998) (citations omitted). Although this rule usually is invoked when the legislature confers authority upon an executive agency, it also has been applied when authority is delegated to a private organization. See, *e.g.*, *People v. Pollution Control Bd.*, 404 N.E.2d 352, 356 (Ill. App. Ct. 1980). Even though the Illinois courts have not formulated extensive principles "on the question of delegation of legislative power to private parties," *id.*, they consistently have held that legislative bodies may not confer upon private organizations the authority to "decide what the law shall be," *People ex rel. Chicago Dryer Co. v. City of Chicago*, 109 N.E.2d 201, 204 (Ill. 1952).

We find no possible (let alone plausible) problem with delegation in POP's complaint. The recital at the heart of its allegations does not delegate anything; it is merely a statement by the City acknowledging that the Foundation was conducting a nationwide search for a location for the Center and expressing its desire that the site be in Chicago. A look at another recital in the 2015 Ordinance confirms that the City did not delegate any authority to the Foundation. It states that "the City will introduce a separate ordinance authorizing the development, construction and operation of the Presidential Center on the Selected Site, if [the University of] Chicago's proposal is selected[.]" The City did exactly that when it approved the plan and passed the 2018 Ordinance.

POP apparently takes issue with that process as well, but it cites no authority supporting the notion that preparing a project proposal is a legislative function, let alone a power that may not be delegated. And the fact that the City

ultimately approved the location is evidence that it, not the Foundation, exercised the legislative function of authorizing the proposed development. Because POP's complaint contains no allegations of wrongful delegation, it fails to state a claim under the separation-of-powers clause of the Illinois Constitution.

## V.    Remaining Theories

As we have now said several times, POP's complaint is chock-full of alternate legal theories, all directed at the same end: stop the Center and restore Jackson Park to its previous condition. We have discussed every approach that was adequately developed in the briefs, but there are still more. Four of the remaining theories (Counts III, V, X and XIV) are based on federal law: the UPARR Act; section 408 of the Rivers and Harbors Act and section 404 of the Clean Water Act; Article 1, Section 1, of the United States Constitution; and section 110(k) of the NHPA, respectively. Each of the other six theories (Counts VII, VIII, IX, XII, XIII, and XV) alleges a violation of Illinois law. The district court rejected all ten. On appeal, POP insists that it is actively pursuing all fifteen. Yet its briefs say hardly a word about the remaining ten, and so we will be equally brief with them.

"An appellant who does not address the rulings and reasoning of the district court forfeits any arguments he might have that those rulings were wrong." *Hackett v. City of South Bend*, 956 F.3d 504, 510 (7th Cir. 2020). The briefs are entirely silent on Counts III, V, IX, XII, XIV, and XV, which means that POP has forfeited any challenges to the district court's rulings on those theories. See *Klein v. O'Brien*, 884 F.3d 754, 757 (7th Cir. 2018).

POP devotes a little space to Count VII, which alleges an *ultra vires* claim against the City, and so, therefore, will we. It describes three allegedly unlawful acts, but it does not identify a law that was violated or otherwise explain how the City acted unlawfully. Because POP's contentions in this connection are "unsupported by pertinent authority," *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991), they have been forfeited.

Last, we have Counts VIII, X, and XIII. The single sentence POP offers to support the first and last of these is representative of the way it treats all three: "as Plaintiffs' constitutional claims in Counts VIII and XIII rely upon the transfer and the sham nature of the 'use' agreement, it was erroneous for the [district court] to dismiss those claims for similar reasons." We do not know which "similar reasons" it intended to invoke, but that vagueness is not the only problem here. As we have said, "[a] skeletal 'argument', really nothing more than an assertion, does not preserve a claim. Especially not when the brief presents a passel of other arguments, as [POP's] did." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (*per curiam*) (citation omitted). Any arguments about the district court's disposition of these three theories have been forfeited.

## VI.    Conclusion

POP and its co-plaintiffs have opposed the City's plan to build the Center in Jackson Park from the start. When we last had this case before us, the plaintiffs were trying to secure a preliminary injunction against the entire project, but they failed to show that they were entitled to such extraordinary relief. Construction of the Center is now well underway, and yet the plaintiffs demand that we put a stop to it and, we assume, order the defendants to restore the site. But they have

failed to show that they are entitled to any relief relating to their overarching claim against the Center, no matter under what theory. The district court did not abuse its discretion by denying the plaintiffs' request for leave to amend. The court also properly ruled that the state-law counts had to be dismissed and, consistent with *POP III*, that the defendants were entitled to summary judgment on the federal-law counts.

The judgment of the district court is AFFIRMED.